888 F.2d 609
 58 USLW 2316, 12 U.S.P.Q.2d 1740
 VISION SPORTS, INC., a California corporation; Vision
Street Wear, Inc., Plaintiffs-Appellees,
v.
MELVILLE CORPORATION, a New York corporation doing business
in California as Melville Shoe Corporation,
Defendant-Appellant.
 No. 89-55592.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 10, 1989.
Decided Oct. 18, 1989.
 
 Robert Neuner, New York City, for defendant-appellant.
 Darrell L. Olson, Newport Beach, Cal., for plaintiffs-appellees.
 Appeal from the United States District Court for the Central District of California.
 Before FLETCHER and NELSON, Circuit Judges, and CARROLL,* District Judge.
 FLETCHER, Circuit Judge:
 
 
 1
 Defendant-appellant Melville Corporation ("Melville") appeals the district court's order issuing a preliminary injunction prohibiting Melville's sale of certain clothing items bearing its "STREET CLOSED" trademark in enlarged, color-contrasted, boldface lettering. We affirm.
 
 I.
 FACTS AND PROCEEDINGS BELOW
 
 2
 Plaintiff-appellee Vision Sports, Inc. ("Vision") is the owner of the trademark "VISION STREET WEAR" and related logo design ("VSW logo"), which it uses in connection with various items of clothing and related products.[1] VISION STREET WEAR clothing bearing the VSW logo accounted for sixty million dollars in sales last year. Appellant Melville operates 564 retail clothing stores located throughout the United States. Melville has sold clothing under the trademark "STREET CLOSED" since 1985. The "STREET CLOSED" mark was registered in 1986.
 
 
 3
 In the fall of 1988, representatives of Melville attempted to purchase VISION STREET WEAR clothing to sell in Melville stores. Vision chose not to sell its VISION STREET WEAR clothing to Melville, preferring to continue selling its clothing through department stores and specialty stores catering to skateboard enthusiasts.
 
 
 4
 Subsequently, Melville began producing its own version of clothing items similar to those sold by Vision. In February of 1989, Melville began using its STREET CLOSED mark in connection with this new line of clothing. Significantly, the STREET CLOSED mark was presented in a format similar to that used by Vision: the word "STREET" appears in large red block letters over the word "CLOSED" in white block letters against a black background.[2]
 
 
 5
 On March 24, 1989, Vision filed a complaint against Melville for federal and state trademark infringement, false designation of origin under section 43(a) of the Lanham Act, trademark dilution, unfair competition, and copyright infringement. Four days later, Melville filed an answer and counterclaimed for a declaratory judgment that it had not infringed or diluted Vision's trademark, competed unfairly with Vision, or infringed any Vision copyright.
 
 
 6
 On April 4, 1989, the district court, at Vision's request, issued a temporary restraining order against Melville. After an April 14, 1989 hearing, the district court issued a preliminary injunction relating to the trademark claims but denied preliminary injunctive relief with respect to Vision's copyright claim. Melville filed a timely notice of appeal. We have jurisdiction over the appeal under 28 U.S.C. Sec. 1292(a)(1).
 
 II.
 
 7
 ISSUANCE OF PRELIMINARY INJUNCTION AND STANDARD OF REVIEW
 
 
 8
 To qualify for a preliminary injunction, the moving party must show either (1) a combination of probable success on the merits and the possibility of irreparable harm, or (2) the existence of serious questions going to the merits and the balance of hardships tipping in its favor. Rodeo Collection, Ltd. v. West Seventh, 812 F.2d 1215, 1217 (9th Cir.1987); Sardi's Restaurant Corp. v. Sardie, 755 F.2d 719, 723 (9th Cir.1985). The district court concluded that Vision established probable success on the merits and the possibility of irreparable harm[3] and issued a preliminary injunction prohibiting Melville's use of a trademark logo format confusingly similar to the VSW logo format.
 
 
 9
 The district court's preliminary injunction order may be reversed only if the district court abused its discretion, based its decision on an erroneous legal standard, or based its decision on clearly erroneous findings of fact. First Brands Corp. v. Fred Meyer, Inc., 809 F.2d 1378, 1381 (9th Cir.1987).
 
 III.
 
 10
 ELEMENTS OF TRADEMARK AND TRADE DRESS PROTECTION
 
 
 11
 The focus of Melville's appeal is the district court's conclusion that Vision demonstrated probable success on the merits. Melville contends that the district court fundamentally misunderstood the right asserted by Vision and consequently applied the wrong legal standard to this case. Specifically, Melville argues that this is not a trademark case, but a trade dress case under section 43(a) of the Lanham Act, 15 U.S.C. Sec. 1125(a). It contends that no trademark rights stem from the format through which Vision presents its VISION STREET WEAR mark. Rather, it insists that any rights possessed by Vision in its trademark format stem from the section 43(a) protection extended to trade dress and are subject to the limitations of trade dress doctrine: namely, that Vision must show its trade dress is nonfunctional, has acquired secondary meaning, and that Melville's use of a similar logo format creates a likelihood of confusion. First Brands, 809 F.2d at 1381. This, Melville claims, Vision cannot do. Evaluation of this argument requires a brief analysis of the distinction between trademark and trade dress claims.
 
 
 12
 A trademark is defined as "any word, name symbol, or device or any combination thereof adopted and used by a manufacturer or merchant to identify his goods and distinguish them from those manufactured or sold by others." 15 U.S.C. Sec. 1127.[4] Because of the very nature of trademark protection, its
 
 
 13
 emphasis and thrust ... is in the direction of deciding whether an alleged symbol in fact functions to identify and distinguish the goods or services of one seller.... In trademark law, therefore, it is only the exclusive symbol characterized as a "trademark" which is juxtaposed against another's usage to determine whether or not the two used by two sellers is likely to confuse consumers.
 
 
 14
 J. McCarthy, Trademarks and Unfair Competition Sec. 2:2, at 52 (2d ed. 1984); see also 15 U.S.C. Sec. 1114 (what constitutes trademark infringement).
 
 
 15
 In contrast, trade dress involves the total image of a product and "may include features such as size, shape, color, color combinations, texture, or graphics." Rachel v. Banana Republic, Inc., 831 F.2d 1503, 1506 (9th Cir.1987). A seller's adoption of a trade dress confusingly similar to a competitor's constitutes unfair competition that is actionable under section 43(a) of the Lanham Act. Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc., 781 F.2d 604, 608 (7th Cir.1986). Trade dress protection is broader in scope than trademark protection, both because it protects aspects of packaging and product design that cannot be registered for trademark protection and because evaluation of trade dress infringement claims requires the court to focus on the plaintiff's entire selling image, rather than the narrower single facet of trademark. J. McCarthy Sec. 8:1, at 282-83. Thus, to the extent that Vision's cause of action focuses upon the look and styling of the clothing (including the fabric pattern), along with the color scheme and graphic display embodied in the VSW logo, it is a trade dress claim.
 
 
 16
 However, Vision claims that the VSW logo, when used as a hang-tag or in printed form on the clothing, also operates as a trademark. A background design, when used in connection with a word mark in such a way as to create in the minds of the consuming public a commercial impression, separate and apart from the word mark itself, may be protected as a separate mark. Id. Sec. 7:8, at 200. Similarly, although color, per se, is generally not capable of trademark protection, it may be an essential element of a protected arrangement of colors, symbols, or words. Id. at 214; see also In re Graham Magnetics, Inc., 226 U.S.P.Q. (BNA) 876 (Pat. & Trademark Off. Trademark Trial & App. Bd.1985) (light-colored rectangular panel on face of tape recording device may be registered in light of evidence of secondary meaning). Thus, if the VSW logo format has attained trademark significance independent of the words "VISION STREET WEAR," adoption of a confusingly similar format would constitute trademark infringement. Vision argues, and the district court found, that the logo format has attained trademark significance.[5]
 
 
 17
 In short, we conclude that Melville's characterization of this case misapprehends significant aspects of Vision's claim. Vision asserts both trademark and trade dress interests in its logo. The district court addressed both the trademark and trade dress interests claimed by Vision and found a likelihood of success on the merits with respect to both claims. The district court did not apply an erroneous legal standard in this case.
 
 IV.
 VISION'S TRADE DRESS CLAIM
 
 18
 "A plaintiff seeking to recover for trade dress infringement under section 43(a) must show that its trade dress is protectable and that defendant's use of the same or similar trade dress is likely to confuse consumers." Fuddruckers, Inc. v. Doc's B.R. Others, Inc., 826 F.2d 837, 841 (9th Cir.1987). A plaintiff's trade dress may be protected if it is nonfunctional and if it has acquired secondary meaning. Id. at 842.
 
 A. Functionality
 
 19
 The focus of the district court's trade dress analysis was the VSW logo, which appears not only on Vision's clothing hangtags, but is featured prominently on Vision's clothing itself. The district court found that the VSW logo is not functional. Functionality is a question of fact, reviewed under the clearly erroneous standard.[6] Clamp Mfg. Co. v. Enco Mfg. Co., 870 F.2d 512, 514 (9th Cir.1989); Fuddruckers, 826 F.2d at 842. A product feature or package design is functional if it is essential to the product's use or if it affects the cost or quality of the article. Id.; First Brands, 809 F.2d at 1381.
 
 
 20
 Citing this court's decision in First Brands, Melville contends that the district court erred in determining that the VSW logo is not functional because it failed to take into account the competitive need for the basic colors red, black, and white. Melville's reliance on this "color depletion" rationale is misplaced.
 
 
 21
 In First Brands, Union Carbide sought a preliminary injunction to prevent the defendants' sale of antifreeze in yellow-colored, "F-style" shaped, one gallon jugs. Id. Carbide argued that the defendants' actions infringed the trade dress of Carbide's PRESTONE II antifreeze. Id. The district court denied the motion for preliminary injunction, concluding that both the shape and color of the PRESTONE II jug are functional. Carbide appealed, arguing that the district court erred in applying the color depletion theory, but this court affirmed, noting that "if Carbide were granted protection of its PRESTONE II trade dress, it would in effect be getting a trademark on the color yellow as a background color for an ordinary shaped container.... [T]his would deplete a primary color available to competitors and deprive them of a competitive need." Id. at 1382-83.
 
 
 22
 Because of the nature of the district court's preliminary injunction, the rationale of First Brands does not apply here. As Vision points out, Melville is not enjoined from using the colors red, black, or white on its clothing labels or screen print. It is enjoined from using these colors in a particular graphic display which may be confusingly similar to the VSW logo format employed by Vision. This case is substantially different from First Brands, where the effect of the proposed injunction would have been to prevent competitors from using yellow as a background color on their antifreeze containers. Cf. Chevron Chem. Co. v. Voluntary Purchasing Groups, Inc., 659 F.2d 695, 703 (5th Cir.1981) (although plaintiff could not preempt the use of red and yellow on lawn chemical packaging, it could "protect the combination of particular hues of these colors, arranged in certain geometric designs, presented in conjunction with a particular style of printing, in such fashion that, taken together, they create a distinctive visual impression"), cert. denied, 457 U.S. 1126, 102 S.Ct. 2947, 73 L.Ed.2d 1342 (1982). Thus, the VSW logo cannot be deemed functional under a "color depletion" theory. Moreover, Melville does not attempt to argue that the particular logo configuration itself is functional. Nor does it argue that the size and location of the logo configuration on the clothing is functional. The district court's conclusion that the VSW logo is nonfunctional was not clearly erroneous.
 
 B. Secondary Meaning
 
 23
 Whether a particular trade dress has acquired secondary meaning is a question of fact, reviewed under the clearly erroneous standard. Clamp Mfg., 870 F.2d at 514; First Brands, 809 F.2d at 1383.
 
 
 24
 A plaintiff's trade dress acquires secondary meaning when the purchasing public associates the dress with a particular source. Fuddruckers, 826 F.2d at 843. The factors to be assessed in determining secondary meaning include: whether actual purchasers associate Vision's trade dress with VISION STREET WEAR products, the degree and manner of Vision's use of the trade dress, and whether Vision's use of the trade dress has been exclusive. See Clamp Mfg., 870 F.2d 517; Transgo, Inc. v. Ajac Transmission Parts Corp., 768 F.2d 1001, 1015 (9th Cir.1985), cert. denied, 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986). An expert survey of purchasers can provide the most persuasive evidence of secondary meaning. Levi Strauss & Co. v. Blue Bell, Inc., 778 F.2d 1352, 1358 (9th Cir.1985) (en banc). Moreover, we have held that proof of copying strongly supports an inference of secondary meaning. Transgo, 768 F.2d at 1016; Audio Fidelity, Inc. v. High Fidelity Recordings, Inc., 283 F.2d 551, 558 (9th Cir.1960).
 
 
 25
 Here, the district court found that the format of the VSW logo has acquired secondary meaning. The district court's findings were based on Vision's extensive use and promotion of the logo and also on Melville's deliberate and close imitation of the design.
 
 
 26
 Melville challenges the district court's reliance on use and promotion of the logo, contending that much of Vision's advertising and promotion was directed toward shoe sales and that the target population of Vision's advertising is the relatively narrow market of skateboarding teenagers. However, at least some substantial part of Vision's advertising and promotion has featured clothing as well as shoes. There is apparently also at least some overlap between the typical consumer of Vision clothing and Melville clothing.[7] It was appropriate for the district court to place some reliance upon Vision's advertising and promotion in finding secondary meaning.
 
 
 27
 Moreover, a consumer survey commissioned by Vision supports the district court's finding that the color scheme and graphic display of the VSW logo have attained secondary meaning. In the survey, more than 81% of the respondents identified the VSW logo, apart from the word mark, with VISION STREET WEAR products. Melville's argument that the survey is irrelevant because it was designed to measure awareness of shoe components is simply incorrect. Vision commissioned six surveys (none directly in relation to this litigation), each analyzing different aspects of commercial impression and source association among Vision's target group of consumers. Some of the surveys related to shoe sales, but one deals specifically with the source designating characteristic of the VSW logo's graphic design.
 
 
 28
 More troublesome is the fact that the population from which the survey sample was drawn was limited to individuals 10 to 18 years old who were participating in or viewing skateboarding or BMX bicycling exhibitions at designated locations, or who had, within the previous year, read specific magazines catering to skateboard or BMX bicycle enthusiasts. The rather limited survey population reduces the probative value of the survey. Undoubtedly, if the survey had included all individuals ages 15 to 25, or males ages 15 to 25 who purchase sports wear or active wear, the percentage of respondents identifying the VSW design would be lower. Nevertheless, the survey, when coupled with the sales and advertising evidence and the uncontroverted evidence of deliberate imitation relied upon by the district court, is sufficient to compel our conclusion that the district court's finding of secondary meaning was not clearly erroneous.[8]C. Likelihood of Confusion
 
 
 29
 The district court's determination that Melville's use of a logo format similar to the VSW logo creates a likelihood of confusion is reviewed under the clearly erroneous standard. See Clamp Mfg., 870 F.2d at 514. Likelihood of confusion in the trade dress context is evaluated by reference to the same factors used in the ordinary trademark context, see Fuddruckers, 826 F.2d at 845: strength of the trade dress, similarity between plaintiff's and defendant's trade dress, evidence of actual confusion, marketing channels used, type of goods and likely degree of purchaser care, and the defendant's intent in selecting its trade dress, Clamp Mfg., 870 F.2d at 517 (stating factors in trademark context); AMF Inc. v. Sleekcraft Boats, 599 F.2d 341, 348-49 (9th Cir.1979) (same). Id. at 517; Fuddruckers, 826 F.2d at 845.
 
 
 30
 Melville contests the district court's finding of likelihood of confusion on a number of different grounds, none of which persuasively demonstrates that the district court's finding was clearly erroneous. A number of Melville's arguments are directed to the strength of its own "STREET CLOSED" word mark and Vision's "VISION STREET WEAR" word mark, both of which are irrelevant to the likelihood of confusion arising from similarity and location of the graphic display employed by the parties.
 
 
 31
 Melville also emphasizes that Vision cannot claim exclusive right to the colors red, black, and white and that numerous third parties use similar color schemes and lettering types. These arguments ignore the fact that the likelihood of confusion determination in trade dress cases must be made in light of "the total effect of the defendant's product and package on the eye of the ordinary purchaser." First Brands, 809 F.2d at 1384; see also AmBrit, 805 F.2d at 984 (use of distinguishing word marks does not preclude finding of similarity of design).
 
 
 32
 The only specific Sleekcraft factor addressed by Melville is the marketing channels used by the parties. Melville argues that it sells to a different target group than does Vision. The accuracy of Melville's argument is open to question. See supra note 6. Moreover, even if we accept this argument, the district court's finding must be upheld on the basis of the other factors--in particular the strength of Vision's logo format, the similarity between the logos, the proximity of the goods, and the defendant's intent in selecting the mark. The last element, in particular, supports a finding of likelihood of confusion. A showing that defendant intended to copy plaintiff's trade dress is entitled to substantial weight in the likelihood of confusion determination. Fuddruckers, 826 F.2d at 845-46. Vision presented credible evidence of intent to copy. In light of all of the relevant factors, the district court's finding of a likelihood of confusion was not clearly erroneous.
 
 
 33
 The district court did not err in finding each of the elements essential to probable success on the merits with respect to Vision's trade dress claim under section 43(a).
 
 V.
 VISION'S TRADEMARK INFRINGEMENT CLAIM
 
 34
 The district court specifically found that Vision is likely to succeed on the merits of its trademark infringement claim. We affirm this conclusion as well. The VSW logo is a registered trademark, subject to protection under 15 U.S.C. Sec. 1114. Apart from the fact that the focus of the trademark claim is the registered mark alone, the analysis of this claim tracks closely the trade dress analysis of section IV. The district court found that the graphic format of the logo, apart from the word mark, has attained trademark significance (i.e., secondary meaning). This finding is amply supported by the evidence. The likelihood of confusion analysis above is also applicable here. The district court did not err in finding that Vision established a likelihood of success on the merits with respect to its trademark infringement claim.
 
 VI.
 SCOPE OF THE INJUNCTION
 
 35
 Melville also argues that the injunction is overbroad and therefore constitutes an abuse of discretion. Specifically, Melville argues that the district court should not have prohibited it from using a black and white format. This format involves the same block offset typeface, but without the red print. This makes it look much less like the VSW logo, as the color contrast is an important part of the overall look of that logo. Nevertheless, there is still a substantial similarity in the overall look created by the use of this format. While this is a close issue, we cannot characterize the district court's inclusion of the black and white format within the scope of the injunction as an abuse of discretion.
 
 VII.
 CONCLUSION
 
 36
 There is sufficient evidence to support each of the findings of fact essential to the district court's conclusion that Vision has demonstrated a likelihood of success on the merits with respect to both its trademark and trade dress claims. It was not an abuse of discretion to prohibit Melville's use of a black and white trademark logo format as well as its red, white, and black format. The district court's injunction order is AFFIRMED.
 
 
 
 *
 Hon. Earl H. Carroll, United States District Judge for the District of Arizona, sitting by designation
 
 
 [1]
 The VSW logo's format consists of the word "VISION" in large red block letters, over the word "STREET" in black letters, over the word "WEAR" in white block letters against a black rectangular background. Vision is the owner of federal trademark registration No. 1,507,260, dated October 4, 1988, for the VSW logo for clothing
 
 
 [2]
 In addition to the red over white-on-black, Melville also used a similar format of black over white-on-black
 
 
 [3]
 In trademark infringement or unfair competition actions, once the plaintiff establishes a likelihood of confusion, it is ordinarily presumed that the plaintiff will suffer irreparable harm if injunctive relief is not granted. See, e.g., Rodeo Collection, 812 F.2d at 1220
 
 
 [4]
 We note that Congress, in enacting the Trademark Law Revision Act of 1988, Pub.L. No. 100-667, 102 Stat. 3935, 3947 (1988), modified slightly the definition of trademark contained in section 1127. These changes are not relevant to this case, both because they are not material to the point being made, and because the Act is not effective until November 16, 1989
 
 
 [5]
 This contention is supported by the fact that Vision made no claim to the exclusive right to use the words "STREET" or "WEAR" in its registration of the VSW logo mark. This suggests that the graphic element or format of the mark is a principal protected element of the mark. In addition, Vision presented survey evidence suggesting that the logo format, apart from the word mark, has attained secondary meaning. See infra Section IV B
 
 
 [6]
 Melville urges us to scrutinize closely the district court's findings of fact because it contends that they were drafted by Vision and apparently adopted without scrutiny. See Purex Corp. v. Procter & Gamble Co., 664 F.2d 1105, 1108 (9th Cir.1981) (suggesting that we engage in a more careful scrutiny of factual findings not prepared by the district court), cert. denied, 456 U.S. 983, 102 S.Ct. 2256, 72 L.Ed.2d 861 (1982). Whether such heightened scrutiny is appropriate is not clear in light of the Supreme Court's language in Anderson v. Bessemer City, 470 U.S. 564, 572, 105 S.Ct. 1504, 1510 n. 1, 84 L.Ed.2d 518 (1985). See Wardley Int'l Bank, Inc. v. Nasipit Bay Vessel, 841 F.2d 259, 261 n. 1 (9th Cir.1988) (suggesting that in Anderson the Supreme Court rejected "close scrutiny" of party-prepared findings adopted verbatim by district courts). Under either approach, we conclude that all of the district court's key factual findings are supported by ample evidence. Thus, we need not decide whether Purex is still good law. Id
 
 
 [7]
 Melville characterizes the target market of its stores as young men ages 15-25. A substantial portion of Vision's sales are to individuals in the lower end of that age group. Moreover, the fact that Melville sought Vision's clothing for sale in its stores and, failing to obtain Vision's clothing, began producing and marketing its own line of similar clothing, supports an inference that the marketing efforts of Melville and Vision are directed toward similar consumer populations
 
 
 [8]
 Because we affirm on this basis, we do not reach Vision's alternative argument that the VSW logo is inherently distinctive and therefore may be protected without a showing of secondary meaning. See Fuddruckers, 826 F.2d at 843-44 (leaving open the question whether inherently distinctive trade dress may be protected without proof of secondary meaning); cf. AmBrit, Inc. v. Kraft, Inc., 805 F.2d 974, 979 & n. 13 (11th Cir.1986) (holding that inherently distinctive trade dress may be protected without a showing of secondary meaning), cert. denied, 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 822 (1987); Blau Plumbing, 781 F.2d at 610 (suggesting same); Chevron Chem., 659 F.2d at 702 (same)