**KEYSTONE RETAINING WALL
SYSTEMS, INC., Plaintiff,**

v.

**WESTROCK, INC. d/b/a Smithwick
Western Block Company, et al.,
Defendants.**

**Civ. No. 91–21–RE.**

United States District Court,
D. Oregon.

Oct. 16, 1991.

Michael H. Simon, Gary U. Schraff, Perkins Coie, Portland, Or., Craig D. Diviney, Ronald J. Brown, Michael E. Florey, Dorsey & Whitney, Minneapolis, Minn., for plaintiff.

James S. Leigh, Patrick W. Hughey, John D. Vandenberg, Klarquist, Sparkman, Campbell, Leigh & Winston, Portland, Or., for defendants.

## OPINION

REDDEN, Chief Judge.

A hearing was held on October 2, 1991 on the parties' cross motions for summary judgment and plaintiff's related motions to strike and to dismiss or partially stay de-

1. Defendants are referred to hereafter throughout this opinion in the singular, as either "Defendant" or "Westblock," as the parties make no

fendants' fourth counterclaim. This opinion will address my rulings on those motions.

## BACKGROUND

Plaintiff Keystone holds certain patents on retaining wall systems and components. It licenses other, independent companies to manufacture and sell its products throughout the country. Keystone itself markets retaining wall systems in only two regions, Minnesota and southern California. Keystone's retaining wall systems incorporate three main components: blocks, as to which Keystone holds various patents; pins (used to connect and align blocks) that are not patented; and soil stabilizing fabric ("geo-grid"). Geo-grid is manufactured by another company, Tensar. Keystone has patented one retaining wall system in which geo-grid is connected to the wall with the same pins that connect and align the blocks (the " '876 patent").

Defendants (collectively "Westblock") are Oregon manufacturers and distributors of their own "Stonewall" retaining wall systems.[1] Keystone sues Westblock for patent, copyright, and trademark infringement, unlawful trade practices, and unfair competition. Westblock asserts counterclaims for interference with contract, unlawful trade practices and unfair competition, antitrust violations, and patent invalidity.

## STANDARDS

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). The materiality of a fact is determined by the substantive law on the issue. *T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Assn*, 809 F.2d 626, 630 (9th Cir.1987). The authenticity of a dispute is determined by whether the evidence is such that a reasonable jury

distinctions between them, and refer to their having merged into a single entity subsequent to the filing of this action.

could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). If the moving party shows that absence of a genuine issue of material fact, the non-moving party must go beyond the pleadings and identify those facts which show a genuine issue for trial. *Id.* at 324, 106 S.Ct. at 2553.

Special rules of construction apply to evaluating summary judgment motions: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *T.W. Electrical,* 809 F.2d at 630.

DISCUSSION

A. *Plaintiff's Motion for Partial Summary Judgment*

Plaintiff moves for partial summary judgment dismissing defendant's counterclaims alleging interference with contract, unlawful trade practices and unfair competition, and antitrust violations.

1. Interference with Contract

■ Defendant's second counterclaim alleges plaintiff intentionally interfered with its contractual relations by communicating with defendant's customers about this dispute. To prevail on this counterclaim, defendant must show: (1) that it had business relations with a third party; (2) that plaintiff intentionally interfered with those relations; (3) that plaintiff acted with an improper motive or by improper means; and (4) that plaintiff's actions caused damage to defendant beyond the fact of the interference. *Official Airline Guides, Inc. v. Churchfield Publishing, Inc.,* 756 F.Supp. 1393, 1408 (D.Or.1990).

■ Plaintiff argues this claim should be dismissed because defendant fails to show

that damages were caused beyond the fact of the interference.

In late March, 1991, Keystone's counsel sent letters to eleven of defendant's customers advising them of this suit and of defendant's alleged patent infringements. These letters concluded with a sentence stating "[i]n addition to the named defendants, anyone who makes, distributes, or installs [Westblock's] Stonewall systems may also be liable for infringement." Salespeople associated with one of plaintiff's licensees made similar remarks to some of defendant's customers verbally. Defendant responded by sending letters to customers assuring them it would hold them harmless from any liability. Defendant also wrote Keystone's licensee, demanding that its salespeople desist from making such remarks.

Defendant contends it subsequently lost wall system sales on a construction project in Vancouver, Washington to plaintiff's local licensee. Defendant also contends it lost anticipated sales of pins to one customer due to that customer's having "heard of" this litigation. These lost sales, however, are not shown to have been caused by defendant's letters or contacts. Neither involves customers alleged to have been written to or contacted by plaintiff. Defendant's contention that they "presumably" resulted from plaintiff's actions is not sufficient. I find that defendant has not shown the existence of a genuine issue of fact as to whether it incurred damages, beyond the fact of the contacts themselves, as a result of these contacts.

2. Unlawful Trade Practices and Unfair Competition

Defendant's third counterclaim alleges that plaintiff's communication with its customers constituted unlawful trade practices and unfair competition.

Causation of damages is again dispositive. A statutory unlawful trade practice claim is available only where an ascertainable loss occurs *"as a result"* of an unlawful practice. ORS 646.656. A common law unfair competition claim also requires a showing of resulting damages. *Airwick*

*Industries, Inc. v. Alpkem Corp.,* 384 F.Supp. 1027, 1032 (D.Or.1974). The same facts relevant to the interference with contract claim are relevant here. Those facts lead me conclude that no genuine issue of fact exists as to causation of damages.

### 3. Antitrust Claims

Defendant's fifth counterclaim alleges violations of section 1 of the Sherman Act and section 3 of the Clayton Act, 15 U.S.C. §§ 1 and 14. Defendant contends plaintiff's licensing agreements restrain trade both by (1) requiring licensees to purchase wall system pins only from plaintiff-approved vendors (a "tying" arrangement), and (2) by prohibiting licensees from dealing in competing goods (an "exclusive dealing" arrangement).

#### a. *Preliminary Matter*

■ In moving against defendant's antitrust counterclaim, plaintiff relies on the affidavit of Robert A. MacDonald. Defendant objects to the admission of the MacDonald affidavit, citing Fed.R.Civ.P. 56(e). Rule 56(e) requires that affidavits be "made on personal knowledge" and "show affirmatively that the affiant is competent to testify to the matters stated therein." Plaintiff's counsel neglected to include in MacDonald's affidavit a statement of the basis for his personal knowledge. Plaintiff contends, however, that MacDonald is the executive vice-president of Keystone; that he has been employed there since June, 1987; and that his identity is well known to defendants, as they took his deposition "more than a month ago." Reply, p. 2, n. 1. In light of these circumstances, I have admitted the affidavit, and consider it in analyzing this motion.

#### b. *Tying Arrangement*

■ In a tying arrangement, a seller uses its power in the market for one product (the "tying" product) to force purchases of another (the "tied" product) that the buyer may have preferred to buy elsewhere. *Jefferson Parish Hospital District No. 2 v. Hyde,* 466 U.S. 2, 12, 104 S.Ct. 1551, 1558, 80 L.Ed.2d 2 (1984). Tying arrangements are forbidden by the anti-

trust laws in order to protect competition in the market for the "tied" product. *Id.* Here, defendant alleges, in effect, that by conditioning its sale of licenses—the tying product—on licensees' commitment to buy pins—the tied product—only from approved sources, plaintiff Keystone undermines competition in the market for pins. Illegal tying can be established on either a per se, or a rule of reason basis. *Hyde,* 466 U.S. at 9, 29, 104 S.Ct. at 1556, 1567.

#### (i.) Per Se Illegal Tying

■ Establishing a per se illegal tying arrangement requires proving that: (1) two separate products are tied together; (2) the defendant has sufficient power in the tying product market to impose restrictions in the tied product market; (3) the arrangement effects a "not insubstantial" volume of commerce in the tied product market; (4) the seller of the tying product coerces the buyer of the tying product into buying the tied product; and (5) the seller of the tying product has an economic interest in the sale of the tied product. *Airweld, Inc. v. Airco, Inc.,* 742 F.2d 1184, 1189 (9th Cir.1984), *cert. denied* 469 U.S. 1213, 105 S.Ct. 1184, 84 L.Ed.2d 331 (1985).

■ I find that plaintiff lacks a sufficient economic interest in the sale of pins, the tied product here. Because the Ninth Circuit finds such an interest essential to establishing a per se tying arrangement, defendant's failure to show a genuine issue of fact requires granting this motion. It is therefore unnecessary to discuss plaintiff's other arguments.

The pins used in plaintiff's wall systems are sold to its licensees by approved third-party manufacturers in which plaintiff has no ownership interest. Plaintiff contends the purpose of the pin source restriction is to control quality, avoid potentially dangerous product failures, and thus to protect the product's name and reputation. Defendant has neither argued nor offered evidence that plaintiff has any direct economic interest in pin sales. It thus fails to show the existence of a genuine issue of material fact.

The Ninth Circuit affirmed summary judgment on this basis in *Robert's Waikiki U–Drive, Inc. v. Budget Rent-a-Car, Inc.,* 732 F.2d 1403, 1407 (9th Cir.1984). There, airlines operated a "fly-drive" program in collaboration with a car rental firm. Plaintiff contended the airlines were offering discounted airline fares (the tying product) on the condition that customers also rent cars (the tied product). The airlines received a $1.00 credit from the car rental firm for each fly-drive package their employees sold. The Ninth Circuit affirmed the district court's conclusion that the airlines did not have a sufficient interest in the car rentals. The Court reasoned:

> In the typical tying scheme, the seller of the tying product also sells the tied product. The tying product seller's interest need not be so direct, however, as long as the seller has an economic interest in the sale of the tied product. [citations omitted] The airlines did not have an adequate interest in the sale of Budget car rentals. Their interest did not go beyond promoting the package in order to sell airline seats.

*Id.,* 732 F.2d at 1408. This case is similar. Plaintiff Keystone has presented evidence that the tied product sellers are independent of it. Plaintiff also presents a plausible explanation for the restriction that is related to its promotion of the tying product, not the tied product.

### (ii.) Rule of Reason

■ To establish illegal tying on a rule of reason basis, a claimant must prove that the arrangement injures competition in the relevant market. It is not sufficient to show merely that the claimant was itself harmed. *Robert's Waikiki U–Drive,* 732 F.2d at 1408.

■ Plaintiff submitted evidence that it has approved four independent pin manufacturers; that it has not refused applications of other manufacturers for approval; and that defendant has not applied to become an approved manufacturer. This tends to show that some competition exists among manufacturers of pins for plaintiff's wall systems. Defendant contends it has

been harmed by the pin source restriction, alleging that "[b]ut for plaintiff's restrictive covenants, [defendant's] [single] attempt to sell pins to [an alleged licensee of plaintiff] may ultimately have succeeded." Defendant's Response Memorandum, p. 9. Defendant only alleges harm to itself, however. Such harm is not sufficient to resist plaintiff's motion under *Robert's Waikiki U–Drive.*

### b. *Exclusive Dealing*

■ Defendant's antitrust claim additionally alleges that plaintiff's licensing agreements prohibit licensees from selling competing products not within the scope of plaintiff's patents. This is, on one hand, an allegation of patent misuse, the subject of one of defendant's own motions for summary judgment, discussed below. Patent misuse does not necessarily violate the antitrust laws, however; antitrust claims must be evaluated separately. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 140, 89 S.Ct. 1562, 1585, 23 L.Ed.2d 129 (1969).

■ In antitrust terms, defendant's claim alleges an illegal exclusive dealing agreement. Exclusive dealing agreements are not illegal unless they foreclose competition in a substantial share of the line of commerce affected. *Twin City Sportservice, Inc. v. Charles Finley & Co.,* 512 F.2d 1264, 1275 (9th Cir.1975) (citing *Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 327, 81 S.Ct. 623, 628, 5 L.Ed.2d 580 (1961)). To determine whether competition is sufficiently foreclosed under this test, it is necessary to determine (1) the line of commerce affected; (2) the geographic area of effective competition; and, finally (3) whether the competition foreclosed is a substantial share of that within the area of effective competition. *Id.*

■ Defendant's counterclaim alleges harm to competition only in conclusory terms. Defendant has not clearly alleged either the particular line of commerce affected (product line) or the geographic area affected, nor shown that the exclusive dealing agreement forecloses competition in a substantial share of the market. Defen-

dant has not presented evidence tending to support its antitrust complaint, and therefore summary judgment is appropriate. *First Nat. Bank v. Cities Service Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 *reh'g denied* 393 U.S. 901, 89 S.Ct. 63, 21 L.Ed.2d 188 (1968); *Kaiser Cement Corp. v. Fischbach and Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir.1986). Defendant's allegations that it has itself been harmed are not sufficient. *Rutman Wine Co. v. E & J Gallo Winery*, 829 F.2d 729, 735 (9th Cir.1987).

Having concluded that summary judgment is appropriate as to each of these three claims, I grant plaintiff's motion for partial summary judgment dismissing defendant's second, third and fifth counterclaims.

### B. *Plaintiff's Motion to Strike*

■ Plaintiff moves to strike a supplemental affidavit submitted by defendant with the reply brief supporting its motion for partial summary judgment of patent misuse. The supplemental affidavit is by defense counsel Garth Winn. It introduces new evidence of a sublicensing agreement including a more restrictive exclusive dealing clause than those referred to in Winn's original affidavit. Its significance is uncertain in light of the fact that it is a *sub*licensing agreement to which plaintiff contends it is not a party. Plaintiff was not afforded an opportunity to respond to this evidence, or to address the issue of its legal responsibility for it. I therefore grant the motion to strike, and do not consider the supplemental affidavit in analyzing the patent misuse motion.

### C. *Defendant's Motion for Partial Summary Judgment of Patent Misuse*

Defendant moves for partial summary judgment of patent misuse and consequent dismissal of plaintiff's second, third and fourth claims for patent infringement.

■ Patent misuse is a defense to patent infringement derived from the equitable defense of "unclean hands." *Dawson Chemical Co. v. Rohm & Haas Co.*, 448 U.S. 176, 186 n. 7, 100 S.Ct. 2601, 2608 n. 7, 65 L.Ed.2d 696, *reh'g denied*, 448 U.S. 917, 101 S.Ct. 40, 65 L.Ed.2d 1181 (1980). Under the patent misuse doctrine, holders of patents granted in furtherance of the public policy of promoting invention are denied enforcement of their patents if they misuse them to extend the scope of their patent monopoly. *Id.* 448 U.S. at 180, 100 S.Ct. at 2605.

Defendant Westblock contends that Keystone's licensing agreements prohibiting licensees from dealing in competing products constitute patent misuse, and thus that its patents are unenforceable. Keystone concedes that its licensing agreements prohibit licensees from dealing in products having a "substantially similar design to," or "characteristics substantially similar to," its patented products.

Licensing agreements that prohibit licensees from dealing in competing products have in the past consistently been held to constitute patent misuse. *National Lockwasher Co. v. George K. Garrett Co.*, 137 F.2d 255 (3rd Cir.1943); *McCullough v. Kammerer Corp.*, 166 F.2d 759 (9th Cir.), *cert. denied* 335 U.S. 813, 69 S.Ct. 30, 93 L.Ed. 36 (1948); *Compton v. Metal Products, Inc.*, 453 F.2d 38 (4th Cir.1971), *cert. denied*, 406 U.S. 968, 92 S.Ct. 2414, 32 L.Ed.2d 667 (1972); *Berlenbach v. Anderson and Thompson Ski Co.*, 329 F.2d 782 (9th Cir.), *cert. denied*, 379 U.S. 830, 85 S.Ct. 60, 13 L.Ed.2d 39 (1964). As recently as 1969, the Supreme Court, in dicta, characterized the patent misuse doctrine in this context as follows:

> [The patentee] may not condition the right to use his patent on the licensee's agreement ... not to purchase, use or sell, another article of commerce not within the scope of his patent monopoly.

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 136, 89 S.Ct. 1562, 1583, 23 L.Ed.2d 129 (1969).

■ Presently, however, rulings of the Federal Circuit are controlling in matters of patent law. 28 U.S.C. § 1295(a)(1). The Federal Circuit requires a factual determination of overall harm to competition as a prerequisite to establishing patent misuse

in the present context. *Windsurfing International, Inc. v. AMF, Inc.,* 782 F.2d 995, 1001–02 (Fed.Cir.), *cert. denied* 477 U.S. 905, 106 S.Ct. 3275, 91 L.Ed.2d 565 (1986). Specifically, this requirement applies to licensing agreement provisions not previously held to be per se anticompetitive by the Supreme Court. *Id.* In announcing this rule, the Court noted that "[r]ecent economic analysis questions the rationale behind holding any licensing practice per se anticompetitive," and cited recent cases and commentary reflecting this trend. 782 F.2d at 1001–02 n. 9.

Defendant contends the *Windsurfing* rule does not apply here because this type of licensing agreement provision is per se anticompetitive. Defendant argues that the Ninth Circuit saw no distinction, in its 1948 *McCullough* decision, between finding that provisions like the one here constitute patent misuse, and the Supreme Court's rationale in *Morton Salt v. G.S. Suppiger,* 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363 (1942). But the *Morton* agreement was different. *See McCullough v. Kammerer Corp.,* 166 F.2d 759, 767–68 (9th Cir.1948) (dissenting opinion of Judge Bone, criticizing the weakness of majority's analogy). The *Morton* licensing agreement bound the licensee to buy a staple commodity, salt, only from the licensor, as a condition of being licensed to use a patented salt dispensing machine. Thus, the *Morton* agreement was a conventional tying arrangement, not an exclusive dealing agreement.

■ I conclude that the *Windsurfing* rule is applicable. Defendant cites, and I find, no Supreme Court case holding licensing agreements of this type per se anticompetitive. Under *Windsurfing,* a finding of overall harm to competition is a necessary predicate to establishing patent misuse. There is no showing of anticompetitive effect here. I deny defendant's motion for partial summary judgment of patent misuse.

D.  *Defendant's Motion for Partial Summary Judgment of Patent Invalidity*

■ Defendant moves for summary judgment of patent invalidity as to plaintiff's '876 patent, and thus for dismissal of plaintiff's second and third causes of action for patent infringement. Defendant contends the patent is invalid because its subject matter was placed "on sale" more than one year before the patent was applied for on May 27, 1987. 35 U.S.C. § 102(b).

The '876 patent is a utility patent describing a wall system in which geo-grid soil stabilizing fabric is connected to the wall by means of the same pins that interconnect and align the blocks. This means of connecting the geo-grid—with the pins—is the distinguishing characteristic of the system.

■ Patents are presumed valid, and the burden of establishing invalidity rests with its proponent. 35 U.S.C. § 282; *D.L. Auld Co. v. Chroma Graphics Corp.,* 714 F.2d 1144, 1147 n. 2 (Fed.Cir.1983). Facts establishing invalidity must be proven by clear and convincing evidence. *Buildex, Inc. v. Kason Industries, Inc.,* 849 F.2d 1461, 1463 (Fed.Cir.1988). A patent is invalidated, however, if the inventor placed the invention "on sale" more than one year prior to the date of the patent application. 35 U.S.C. § 102(b); *Buildex,* 849 F.2d at 1462. This "on sale" rule is intended to durationally limit pre-application commercial exploitation of the invention by its inventor to one year. *Auld,* 714 F.2d at 1147.

■ Whether a product was placed "on sale" within the meaning of the rule is a question of law. *UMC Electronics Co. v. United States,* 816 F.2d 647, 657 (Fed.Cir. 1987), *cert. denied* 484 U.S. 1025, 108 S.Ct. 748, 98 L.Ed.2d 761 (1988). An actual sale need not have occurred. *Auld,* 714 F.2d at 1150. A definite *offer* to sell is required, but this requirement can be satisfied by a patentee's commercial activity which does not rise to the level of a formal offer under contract law principles. *RCA Corp. v. Data General Corp.,* 887 F.2d 1056 (Fed. Cir.1989). It merely excludes "indefinite or nebulous discussion about a possible sale." *Id.*

Defendant here contends that the '876 patent is invalid because plaintiff offered

to sell a wall system incorporating pin-attached geo-grid for use in the Lemay Lake Hills project ("Lemay project") in Eagan, Minnesota in April of 1986, more than one year in advance of the patent application. Plaintiff counters principally that a material issue of fact exists as to whether the Lemay proposals incorporated the patented concept. Plaintiff also contests whether the proposals constituted an offer.

Development of the Lemay project was pending in the spring of 1986. The plans called for a retaining wall to be located between, and running parallel to, two public roadways, one sitting higher than the other. The wall was to be built on city property, but at the private developer's expense, apparently as a condition of city approval for the development. Upon its completion, the city was to both own and maintain the wall. City approval was required of the wall's design and structural engineering. The developer, Al Kempf, gave deposition testimony that an early plan to build a wooden retaining wall had been rejected by the city as inadequate.

Paul Forsberg, plaintiff Keystone's president, contemplated selling a wall system for use on the project. It is not clear when or how he approached Kempf. Notes of a meeting on the project, however, reflect that the city tentatively approved the use of a Keystone wall system on April 2, 1986. This meeting included developer Kempf, city engineering officials, and project architects. In a subsequent April 11, 1986 meeting, Kempf and representatives of these same groups again met, and were joined by Keystone sales representative Brad Hanson.

The April 11 meeting notes state that the city would require structural calculations and cost estimates for the Keystone wall prior to approving construction. To assist it in providing the necessary engineering, design, and structural analysis, Keystone retained the services of a consulting engineer, John Kliethermes. Brad Hanson represented Keystone in providing a series of cost estimates.

Forsberg testified that attaching geo-grid to retaining wall blocks with pins first occurred to him in early April, 1986 after he saw a brochure published by the manufacturer of geo-grid, Tensar Corporation. Forsberg Deposition, pp. 183, 187. He called Kliethermes and asked him to determine whether the Keystone wall system's pins would fit through the Tensar geo-grid. *Id.* p. 184. Kliethermes determined that it would, and advised Forsberg of this "within a day or two." *Id.* p. 184–85. When asked in deposition what he did next, Forsberg first responded "I said go ahead and use it for Lemay Lakes." He then backtracked:

> Excuse me. Go ahead and use it. I said not Lemay Lakes. I said go ahead and use it. Don't know if I referenced exactly that job or not. I think I said let's use it then.

*Id.* at 185.

Mr. Forsberg's associate Mr. Potter recalled in his deposition that Forsberg asked Kliethermes to do a design analysis on the Lemay wall for submission to the Eagan City officials. Kliethermes did such an analysis on April 18, 1986. That analysis assumed, and was consistent with, connection of the geo-grid in the manner that ultimately was patented. It does not expressly state that the pins would anchor the geo-grid, but did state that "[t]he Keystone units are attached to a soil reinforcement fabric...." Two aspects of the April 18 analysis demonstrate, however, that it did envision attachment of the geo-grid through the pins. First, in determining the length of the geo-grid required, the analysis accounted for the full two foot depth of the blocks. Second, the analysis evaluated whether the pins could bear the burden of anchoring the geo-grid: "check[ed] pins to resist tension by tensar grid" and determined that the anchored geo grid would not unduly stress the pins. Kliethermes himself testified that the design in the April 18 analysis assumed that the geo-grid was to be placed over the pins of the Keystone blocks. Kliethermes Deposition, p. 18–19.

Kliethermes's April 18 analysis is referenced in a drawing depicting the proposed retaining wall prepared by the architect for the Lemay project on April 24, 1986. Brad

Hanson testified that sometime between April 14 and April 24, he delivered an analysis prepared by Mr. Kliethermes to Strgar Roscoe, the engineering firm retained by the City of Eagan. Hanson stated that he picked up a design analysis of the wall he understood was being proposed by Keystone for the Lemay project from mr. Kliethermes office, and delivered it, without opening the envelope, to Strgar Roscoe for its review. Hanson Deposition, p. 24.

Kliethermes subsequently prepared a further analysis on April 29. The April 29 analysis does not expressly refer to pin-connection of geo-grid. Kliethermes testified, however, that in preparing it, he again assumed that the geo-grid would be connected by the pins. Kliethermes Deposition, p. 31.

On April 14, April 24, and April 29, Hanson wrote letters to the city containing various cost estimates. The April 24 and April 29 estimates itemize components, including varying amounts of geo-grid, referred to as "Tensar Mat."

Mr. Forsberg testified in deposition that the later patented pin-connection means of attaching the geo-grid was the only one being contemplated at the time of Hanson's April 29, 1986 letter to the City of Eagan. Forsberg Deposition, p. 389. Mr. Potter testified that Hanson offered on behalf of Keystone to sell a wall incorporating the patented scheme, though he did not state the date of such an offer.

Plaintiff argues that this evidence does not establish that Keystone proposed a geo-grid-connected-to-pins wall for the Lemay project in April, 1986. It contends: (1) the sole explicit reference to a pin connection of the geo-grid was in Kliethermes's April 18 analysis, and that analysis did not *require* pin-connection; (2) Kliethermes merely evaluated the *feasibility* of the pin-connection approach in the April 18 analysis; (3) Forsberg's recollection of the means by which connection was contemplated is irrelevant, because it was Kliethermes and Hanson who were directly involved in making the proposals, and Hanson did not understand that the geo-grid

was to be attached at all; (4) Kliethermes personally believed that pin-connection of the geo-grid was unnecessary; and (5) Geir Seger, the Strgar Roscoe engineer retained by Eagan city officials to evaluate Kliethermes's April 18 analysis, did not understand it to have proposed pin-connection of the geo-grid. Plaintiff contends on this basis that defendant has not shown clearly and convincingly that the April proposals incorporated the later patented pin-connection of geo-grid.

Plaintiff's contentions do not persuade me. First, that the April 18 analysis contains the only explicit reference to pin-connection of the geo-grid is not significant in the context of the other evidence. The April 18 analysis is the only allusion to *any* geo-grid connection method in the pre-critical date proposals, and it is undisputed that connection was proposed to ensure the wall's structural integrity. Forsberg, plaintiff Keystone's president, asked Kliethermes to evaluate whether geo-grid would fit over Keystone pins. Upon Kliethermes's determination that it would, Forsberg told Kliethermes to "use it," although he disputes whether he meant on the Lemay job. Forsberg subsequently asked Kliethermes to perform an engineering analysis for the Lemay project. Kliethermes's April 18 analysis was submitted to the engineer retained by the city. It was also submitted to the project architect, retained by the developer. A Keystone wall had already been tentatively approved. The evidence demonstrates that efforts were focused at this stage on making and evaluating specific proposals for structural integrity and compatibility with nearby utility fixtures at the site and their anticipated maintenance. There is no evidence that any other means of connection was contemplated or proposed. Kliethermes testified that he envisioned pin-connection in both the April 18 and 29 analyses.

Nor is plaintiff's contention that pin-connection was not *necessary* to the wall significant. It is not disputed that some means of connection was envisioned. The Berg and Florey affidavits submitted by plaintiff merely establish that other means

of geo-grid connection *might have* been contemplated. They do not establish any probability that other systems *were* contemplated. Nor do the affidavits contradict Forsberg's own testimony that only pin-connection was contemplated at the time of the April 26 Hanson letter. *See Auld* 714 F.2d at 1151 (issues of material fact are not raised by affidavits which do not even contradict the patent owner/inventor's own prior admissions). That other means of connection were possible does not undermine the conclusion that pin-connection was proposed here, even if, as can only charitably be inferred, as an alternative.

Plaintiff's argument that Kliethermes merely analyzed the feasibility of pin-connection is also unpersuasive. It is undermined first by the circumstances of the analysis's submission, discussed above. It is further damaged by Kliethermes's own deposition, in which the following exchange occurred.

BY MR VANDENDERG:

Q: Why did you prepare Exhibit 332 [the April 18 analysis]?

A: To design the retaining wall at LeMay Lakes.

Q: Did you intend that your design analysis would be an analysis of the wall that would actually be constructed at LeMay Lakes?

A: At the time I produced or designed this document, I was designing a suggestion, a suggested wall. I was trying to evaluate a wall that would fit the project.

Q: The Specific project at LeMay Lake?

A: That's correct.

Kliethermes Deposition, p. 6–7.

Plaintiff contends that Brad Hanson's misunderstanding that there would be no attachment between the wall and the geo-grid shows that pin-connected geo-grid was not proposed. That Hanson had such a misunderstanding, however, more effectively demonstrates that he was not familiar with the specifics of the design. The April 18 analysis stated clearly that the geo-grid was to be attached to the wall. Hanson himself testified that he delivered

at least one engineering analysis from Kliethermes to Strgar Roscoe without even opening it. His letters to the city do not address wall design at all. They are one-page price quotes.

Plaintiff also argues that Kliethermes himself believed that pin-connection of the geo-grid was unnecessary to the Lemay wall's design. Here plaintiff relies on depositions of persons not directly involved, whose testimony is largely hearsay. The absence of any testimony by Mr. Kliethermes on this point is telling. Even assuming, however, that Mr. Kliethermes did not believe the pin-connection essential, this does not undermine the evidence that it was proposed.

Plaintiff next contends that the Strgar Roscoe engineer retained by the City of Eagan, Geir Seger, who received the April 18 Kliethermes analysis, had not understood it to envision pin-connection of the geo-grid to the Keystone wall. Seger's deposition bears this out. It further demonstrates, however, that Mr. Seger had delegated the "detail-checking" of the analysis to subordinate engineers. Seger Deposition, pp. 31, 35. When initially asked about the reference in the analysis to checking the pins to determine if they would withstand the tension of the geo-grid, Mr. Seger responded that "I did not do the detail checking so it would be a point I would have not looked at. That was my engineers." *Id.*, p. 35. When he reviewed the references of the April 18 analysis to pin-connection, Mr. Seger agreed they indicated with certainty that Mr. Kliethermes had envisioned the geo-grid would be hooked over the pins. *Id.*, p. 36.

Plaintiff also argues that the price quotes involved here were made to the city, and not to the actual purchaser, developer Al Kempf. Therefore, plaintiff continues, the proposals did not constitute an offer. Plaintiff characterizes Hanson's correspondence to the city as having been merely "to navigate the approval process," and contends no formal offer was made to Al Kempf until July. This whole line of argument is undermined by the fact that the city was always to be the wall's ultimate

owner. The city is fairly characterized as having been the wall's co-purchaser from the outset. Plaintiff's own evidence of the later, July offer, a letter from Hanson to Kempf, is consistent with this view. It notes that the city would make the ultimate decision on the method of geo-grid connection.

The earlier April discussions, moreover, had clearly included Al Kempf. The notes of the April 2 and 11 meetings reflect his presence. Those discussions appear to have been neither nebulous nor indefinite. *See RCA v. Data General Corp.*, 887 F.2d 1056, 1062 (Fed.Cir.1989). The minutes of the April 2 meeting state that the city had already approved, at least tentatively, a Keystone wall. Keystone continuously participated in the plan refinements thereafter. Kempf himself testified that he understood—in April, 1986—that the geo-grid was to be connected to the blocks through the pins. Kempf Deposition, pp. 29–30. The wall was ultimately built with pin-connected geo-grid in October, 1986.

That Hanson's April correspondence was to the city rather than to Kempf does not preclude its constituting an offer within the meaning of the "on sale" rule. In stating that a formal offer satisfying contract law principles is not required to place an invention "on sale," the *RCA* court cites with approval the analysis of a comparable situation by the U.S. Court of Claims in *General Elec. Co. v. United States*, 206 USPQ 260, 276–77, 1979 WL 25152 (Ct.Cl.1979). There, a defense contractor's initial presentation of an invention to certain Air Force representatives was found to have constituted placing the invention "on sale." The patentee/defense contractor argued that the presentation was only to "sell" the technical people, and not to sell the invention itself. None of the representatives to whom it had been presented had contracting authority. Nonetheless, the court noted, their approval would be required to initiate the procurement process. Here, similarly, plaintiff Keystone argues in essence that it was only "selling" the city's technicians in April. The city's approval, however, was a necessary step toward the ultimate sale.

I find that the evidence demonstrates clearly and convincingly that Keystone proposed a wall incorporating pin-connected geo-grid as a means of winning city approval and thus closing the Lemay project sale in April, 1986. I therefore grant defendant's motion for partial summary judgment of patent invalidity.

### E. *Defendant's Motion for Partial Summary Judgment Dismissing Plaintiff's Trademark Claim*

■ Defendant moves for summary judgment dismissing plaintiff's trademark claim on the ground plaintiff's "trade dress" is functional, and therefore not protectable. The question of functionality is the crux of the motion. I conclude defendant fails to show there is no genuine issue of material fact. I therefore deny the motion.

Plaintiff's trademark claim asserts a "trade dress" interest in the "facing design," or "overall wall facade" of the Keystone retaining wall system. Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) ("Section 43"). Plaintiff contends this interest is infringed by use of the same or similar design in defendant's Stonewall retaining wall system.

■ A claimant seeking recovery for trade dress infringement under section 43(a) must show that its trade dress is protectable and that the defendant's use of it is likely to confuse consumers. *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 613 (9th Cir.1989) (quoting *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 841 (9th Cir.1987)). Trade dress is protectable only where it is nonfunctional and has acquired secondary meaning. *Id.* Functional items are not afforded trade dress protection because granting exclusive use in a functional item hinders competition. *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 842 (9th Cir.1987). Whether trade dress is functional or not is a question of fact. *Vision Sports*, 888 F.2d at 614.

A product feature is functional if it is essential to the product's use or if it affects the cost or quality of the article. *Id.* Factors to be considered in evaluating functionality include: (1) whether an expired utility patent discloses the utilitarian advantages of the design sought to be protected; (2) the extent of advertising touting the utilitarian advantages; (3) availability of alternative designs; (4) and whether the design results from a comparatively simple or cheap method of manufacture. *Clamp Mfg. Co. v. Enco Mfg. Co.*, 870 F.2d 512, 516 (9th Cir.1989) (citing *In re Morton–Norwich Products, Inc.*, 671 F.2d 1332, 1340–41 (C.C.P.A.1982)). That a product feature includes functional elements does not preclude its being deemed nonfunctional and therefore protected. *Fuddruckers*, 826 F.2d at 842. Trade dress is examined as a whole to determine its functionality. *Id.* "[F]unctional elements that are unprotectable separately can be protected together as part of a trade dress." *Id.* The inquiry is addressed to whether the whole collection of elements taken together are functional. *Id.*

Here plaintiff claims a protected trade dress interest in the distinctive appearance of the "facade of an assembled Keystone retaining wall" made up of Keystone blocks. Plaintiff asserts that this appearance consists of four distinct interacting elements: (1) the split-face texture of the face of the blocks; (2) the "angular yet generally curvilinear contour" of the block faces; (3) the distinctive pattern of the wall surface, created by staggering convex and concave contours both horizontally and vertically; and (4) the resulting shadow patterns created on the face of a Keystone wall by the combination of the texture and the shape of the face.

To prevail on this summary judgment motion, defendant must establish the absence of a genuine issue as to the material fact of functionality. Defendant attempts to do so by contending that plaintiff must prove nonfunctionality as to *each* element of the trade dress. Defendant then argues that plaintiff cannot do so, citing utilitarian attributes of each of the four elements. Defendant's Reply memo, p. 3–4. The Ninth Circuit's law on trade dress functionality, however, is contrary. Unprotectable elements may, together, be deemed nonfunctional trade dress. *Fuddruckers*, 826 F.2d at 842. Moreover, the multi-factored analysis called for in *Clamp* reveals that an element of trade dress may have a utilitarian attribute yet still be deemed to be nonfunctional, as where alternative designs are available that achieve the same utilitarian ends. I deny defendant's motion for partial summary judgment dismissing plaintiff's trademark claims.

**F.** *Plaintiff's Motion to Dismiss or Partially Stay Defendant's Fourth Counterclaim*

This motion is moot, as the parties report the counterclaim has been settled.

CONCLUSION

Plaintiff's motion for partial summary judgment dismissing defendants' second, third, and fifth counterclaims is GRANTED. Plaintiff's motion to strike an exhibit is GRANTED. Defendant's motions for summary judgment of patent misuse and dismissing plaintiff's trademark claims are DENIED. Defendant's motion for partial summary judgment of patent invalidity is GRANTED. Plaintiff's motion to dismiss or partially stay defendant's fourth counterclaim is MOOT, as the parties report that it has been settled.