TRW FINANCIAL SYSTEMS, INC., Plaintiff and Counter–Defendant,

v.

UNISYS CORPORATION, Defendant and Counter–Plaintiff,

v.

TRW, INC., Counter–Defendant.

No. 90–CV–71252–DT.

United States District Court, E.D. Michigan S.D.

Oct. 19, 1993.

Robert C. Kahrl, Cleveland, OH, J. Thomas Lenga, Detroit, MI, for plaintiff and counter-defendant.

Douglas E. Whitney, Wilmington, DE, David A. Etlinger, Detroit, MI, for defendant and counter-plaintiff.

### OPINION AND ORDER REGARDING MOTIONS FOR SUMMARY/PARTIAL SUMMARY JUDGMENT AND FOR DISMISSAL

ROSEN, District Judge.

## I. INTRODUCTION

This patent infringement action is presently before the Court on three Motions for summary or partial summary judgment and dismissal. Defendant Unisys has moved for summary or partial summary judgment pursuant to Fed.R.Civ.Proc. 56 on two issues: (1) statutory "on-sale bar", and (2) "inequitable conduct" predicated on the alleged withholding of "on-sale bar" information from the patent examiner. TRW has cross-moved for summary judgment on the issue of statutory "on-sale bar", and has also moved, pursuant to Fed.R.Civ.Proc. 12(c), for dismissal on the pleadings of Unisys's antitrust counterclaim.

Having reviewed and considered the parties' respective motions, briefs and supporting documents, and having heard the oral

arguments of counsel at the hearing held on July 26, 1993,[1] the Court is now prepared to rule on these pending dispositive motions. This Opinion and Order sets forth that ruling.

## II. *FACTUAL BACKGROUND*

This case involves a patent for a video document processing system[2] which was originally applied for by Emmett Burns and Morris Ho of Teknekron, Inc., the predecessor-in-interest of Plaintiff TRW, on March 21, 1977.[3] That March 1977 parent application was subsequently declared abandoned following the filing of a "continuation-in-part" application ("CIP") on July 3, 1978.

A. *Teknekron's Pre–Application Activities Involving the Document Processing System*

1. *Crocker National Bank*

In the summer of 1974, Teknekron was engaged by Crocker National Bank as a consultant to evaluate the bank's remittance processing "lockbox" operation.[4] After Teknekron's team completed its two-month study of the Crocker operation, and after having visited and analyzed the lockbox processing utilized by five other banks and the alternative automated systems then available on the market, on August 1, 1974, Teknekron issued a 79-page report recommending that Crocker retain Teknekron to design, implement, install, and train personnel in the use of an automated video-enhanced system that would meet the bank's lockbox needs.

Crocker accepted Teknekron's proposal, and on December 19, 1974, Teknekron and Crocker entered into a written contract for the development and installation of an auto-

mated lockbox system. The agreement called for a three-phase development of the system over 13 months. The three-phase task included a projected 2–month "system design phase", a 10–month "fabrication and implementation phase", and a 1–month "installation and training phase." This agreement was subsequently amended several times extending the period of performance and modifying the payment terms. In one of the amendments to the Crocker Bank contract, Crocker Bank agreed "to support and assist [Teknekron's] marketing program for the Lock Box System by participation in demonstrations, responding to inquiries and similar sales activities as may be determined by the parties." [See April 18, 1975 Amendment, DDX 87].

Teknekron's development and assembly of the automated lockbox system for Crocker Bank was, for the most part, done at Teknekron's Berkeley, California facility. The system was not physically delivered to Crocker Bank until May 20, 1976, and was not put into operation at the Bank until June 17, 1976. [See Plaintiff's Ex. E]. However, the system was actually operational at Teknekron's facility well before the May 20, 1976 delivery to Crocker. Inventor Emmett Burns advised Crocker Bank and Teknekron staff involved in the lockbox project early in December 1975 that "one of everything (in the system) [was] working" as of December 9, 1975. [See DDX 153, Minutes of Meeting held at Crocker December 9, 1975, p. 1.] By mid-December, the system with substantially all of its integrated components working together was operational. Emmett Burns, in fact, took the Crocker group to Teknekron's facility on December 17, 1975 to view the

---

1. Although no formal argument was conducted on TRW's Motion to Dismiss Unisys's Counterclaim, the Court has determined that the arguments of counsel on July 26, 1993 on Unisys's "inequitable conduct" motion provided the Court with all of the argument it would need on the Motion to Dismiss. Therefore, pursuant to Local Rule LR 7.1(e), the Court will decide the Motion to Dismiss Unisys's Counterclaim "on the briefs".

2. The patent at issue is sometimes referred to herein as the " '780 patent".

3. The Burns/Ho patent was assigned to Teknekron, and it subsequently became the property of TRW after TRW took over Teknekron.

4. A "lockbox" or "remittance processing" system is a document processing system which handles customer payments mailed to a central mail box. The payments typically involve a remittance document, which is a detached portion of the customer's bill, and a payment check. The system collects the checks for transmittal to bank processing centers and makes the accounting entries to reflect the customer payments.

system developed for Crocker in operation. [See DDX 154, Minutes of Meeting held at Teknekron on December 17, 1975, p. 1.][5]

### 2. *Philadelphia National Bank*

In late April 1975, Teknekron approached a number of banks throughout the country about purchasing from Teknekron a lockbox system similar to the Crocker Bank system. One of the banks approached was Philadelphia National Bank ("PNB"). Teknekron proposed to develop for PNB a lockbox system similar to the one developed for Crocker Bank, but tailored for PNB's particular environment and requirements. In an April 30, 1975 letter to the vice-president of Philadelphia National Bank, Teknekron described its Crocker Lock Box System as follows:

Teknekron has been working for over a year with Crocker National Bank in order to develop an innovative and cost effective system for lock box automation. In this effort we have used both our hardware engineering and software development expertise. We have been successful and are implementing a system that will lower retail and wholesale costs while providing excellent production statistics to monitor both individual productivity and cost by account, outputs tailored to the needs of clients, easy expandability for increasing volume, and improved personnel morale.[6]

[DDX 47]

Teknekron further proposed to produce a similar system for PNB:

The study [for PNB] will develop specifications for automation of the Bank's Lock Box operation. The specifications will be for a system similar in concept to the system developed for Crocker but tailored to your Bank's environment and requirements.

*Id.*

The Teknekron–PNB discussions culminated in the execution of a written agreement in October 1975 for Teknekron to conduct an evaluative study for PNB similar to that conducted for Crocker Bank in the summer of 1974. [See DDX 49.] The PNB study was completed, and on January 19, 1976, Teknekron submitted its study report with a proposal to sell PNB an automated lockbox system similar to the Crocker Bank system on January 19, 1976.

On July 29, 1977, PNB sent Teknekron a "letter of intent" to purchase the automated remittance processing lockbox system described in Teknekron's January 1976 proposal.[7] A formal agreement regarding PNB's purchase of the system was ultimately executed between the parties on September 27, 1977.

### B. *Edward Maker's Assessment of the Statutory "On–Sale" Bar*

Edward Maker of Flehr, Hohbach, Test, Albritton & Herbert was the patent attorney retained to prosecute the Burns/Ho/Teknekron patent. On December 30, 1975, Maker wrote to David Fain, Teknekron's project manager on the Crocker Bank system pro-

---

5. It actually appears that a "prototype" of the system was operational a month earlier, in mid-November 1975. Teknekron, in fact, demonstrated operation of the prototype for Cummins Allison, the manufacturer of the transporter unit used in the system, in November 1975. The demonstration for Cummins Allison was for the purpose of interesting that company in purchasing the video scan camera used in Teknekron's system. [See DDX 149, 151.]

6. Identical language was also used in the solicitations of other banks. *See*, e.g., Defendant's Hearing Ex. 4, April 22, 1975 letter from Teknekron to First National Bank of Chicago.

7. PNB's July 29, 1977 letter to Mr. Gerald J. Burnett of Teknekron stated:

Dear Gerry,
Please accept this as our "letter of intent" to proceed with implementation of the Remittance Processing System essentially as described in your proposal dated January 19, 1976.
We are in receipt of your revised "Implementation and Maintenance Agreements" and have passed these on to our legal counsel for their review and comments. We would hope that any discrepancies in these documents can be resolved through our respective counsels and that a formal contract can be executed in the very near future.
We are looking forward to the successful implementation of your system and a mutually beneficial relationship.
Very truly yours,
/s/William P. Miller, Jr.
Senior Vice President

ject, and Allen Gould, Teknekron's in-house counsel, stating that the "invention was offered for sale during the month of April 1975 and [therefore] has a statutory bar date of April 1976". A week later, on his office file opening form, Maker indicated "April 18, 1975" in the space marked "STATUTORY BAR DATE MAY BEGIN TO RUN".

Once again two months later, in February 18, 1976 correspondence to David Fain, Maker reiterated that

> this invention has a statutory bar that runs during April 1976 because the invention was offered for sale during the month of April 1975. In order to preserve Teknekron's patent rights, any patent application covering this invention must be completed and filed in the U.S. Patent Office prior to April 1976.

[DDX–667–19]

However, six weeks later, with Maker's initial April 1976 deadline date rapidly approaching, Maker re-evaluated his original "on-sale bar" determination. In a March 30, 1976 Conference Memo regarding a conference between Maker and Aldo Test, another attorney with Flehr, Hohbach, Maker notes:

1. [I] told Al all of the details of contract.
2. We agree that there is no bar even running as yet. Probably will begin to run when the machine is accepted.

[DDX 77C–3]

Then, in a letter the next day, March 31, 1976, to inventor Emmett Burns, which was copied to David Fain and Donald Gould, Maker explained his reconsideration of the on-sale bar date:

> In our letters of December 30, 1975 and February 18, 1976 we stated that the invention was offered for sale during the month of April 1975 and cautioned that to preserve Teknekron's patent rights, a patent application must be filed prior to April 1976.
>
> This April 1975 date was based upon oral interviews at Teknekron and was not deeply researched. Now that April 1976 is approaching we have looked more carefully

into the situation. In particular, we have reviewed the basic contract between Teknekron and Crocker National Bank dated December 19, 1974; [and] the amendments to it....

> Based on our review of these documents, it is our opinion that your agreement with Crocker National Bank is essentially a contract for the sale of services. It is not a contract for the sale of goods and an actual sale of the invention has not yet occurred [sic].
>
> A sale has not yet occurred [sic] in a legal sense because the system has not yet been delivered to Crocker or been accepted by it. In fact the system will not be ready for shipment until mid-April 1976....
>
> Thus, we are of the opinion that under 35 USC 102 a statutory bar has not commenced to run against this invention and Teknekron has at least one year in which to file a patent application on this invention....

[DDX–667–10 and 11]

After learning during a December 1, 1976 meeting with Emmett Burns that Teknekron had shipped the system to Crocker National Bank on May 20, 1976 [see Conference Memo at DDX–698], Maker revised his patent filing deadline date to May 20, 1977 [see DDX–77D, 81B].

Maker did meet that deadline, and the first patent application was filed on March 21, 1977.

C. *The Filing of a Continuation–In–Part ("CIP")*

The March 1977 patent application was limited to an analog video memory system.[8] The Crocker Bank system used only analog memory and, consequently, Burns, Fain and Maker expressly decided to limit the original patent application to "analog" memory. However, after Maker's suggested May 20, 1977 statutory bar date had passed, Teknekron determined that technical and economic developments made it preferable to use "digital" video memory in the Philadelphia Na-

---

8. An analog memory stores information as analog signals. Common examples of analog memory are video or audio cassette tapes. Alternative technology can store information as "digital" data, as in the memory or drives of digital computers.

tional Bank system. The first patent application did not cover such a digital system, and, in fact, Teknekron expressly distinguished the prior art's digital approach in the patent application. [See p. 2 of the March 18, 1977 Patentability Statement filed with the U.S. PTO in connection with Burns' patent application at DDX–26.]

In March 1978, Maker met with Emmett Burns and Gerald Burnett at Teknekron and decided to expand the patent application to claim for the first time both the analog and digital video memories. The second application would be a "continuation-in-part" ("CIP"). In a memorandum to his file regarding this March 7, 1978 meeting, Maker noted:

> I specifically pointed out the risk of the Examiner making a second search on the common subject matter and also the problem of a second statutory bar running against the new material in the CIP.

[DDX–667–24.]

The CIP was filed on July 3, 1978 and the '780 patent was finally issued on June 3, 1980.

The video document processing invention claimed in the '780 patent (i.e., the invention at issue in this suit) includes several components that operate together. The invention includes:

> 1. A means for reading and storing machine readable data encoded on the document being processed;
>
> 2. A video camera for capturing the image of the document being processed;
>
> 3. A video memory connected to the video camera for storing the signal corresponding to the image of the document captured by the camera;
>
> 4. A transporter for passing the documents past both the video camera and data reader.

## III. *THE PARTIES' ARGUMENTS*

1. *The "On–Sale" Bar Motions*

Defendant Unisys raises two arguments in support of its contention of invalidity and/or

unenforceability of the '780 patent. First, Unisys contends that the Crocker Bank sale and/or the PNB offer constituted a commercial "sale" of the invention, (or, with respect to PNB, an offer for sale) which occurred more than a year before the filing of the original patent application.[9] Therefore, Unisys argues that the '780 patent is, as a matter of law, invalid because of the statutory bar provisions of 35 U.S.C. § 102(b).

Second, Unisys argues that potential "on-sale bar" issues must be disclosed to the Patent Office for resolution by the patent examiners. In this case, however, Unisys claims that at no time during the pendency of either the parent or CIP patent application—from March 21, 1977 to the issue date of June 3, 1980—did patent prosecution attorney Edward Maker or anyone else connected with the '780 patent reveal any facts to the Patent Office about the Crocker Bank sale or the PNB offer. Unisys contends that such suppression of potential on-sale bar issues constitute inequitable conduct as a matter of law, and thus, render the '780 patent unenforceable even if it is not rendered invalid by virtue of an actual on-sale bar.

TRW counters that the work done by Teknekron for Crocker Bank prior to the original patent application's statutory bar date of March 21, 1976 was experimental and developmental in every respect, and because there were numerous problems being continuously ironed out both while the system remained at Teknekron's facility and after it was delivered to Crocker, it cannot be deemed to have been "operational" prior to the statutory bar date. Thus, TRW contends that the statutory on-sale bar provisions of 35 U.S.C. § 102(b) do not invalidate this patent.

With respect to Unisys's "failure to disclose to the patent office" inequitable conduct argument, TRW first contends that the following "disclosure" in the "specification" portion of the patent application was sufficient notification to the patent examiner of the pre-March 21, 1977 commercial use of the invention by Crocker:

---

9. Relying on the recent decisions of *Paragon Podiatry Laboratory v. KLM Laboratories, Inc.*, 984 F.2d 1182 (Fed.Cir.1993) and *Sinskey v. Pharmacia Ophthalmics, Inc.*, 982 F.2d 494, 25 (Fed.Cir. 1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 2346,

124 L.Ed.2d 256 (1993), Unisys argues that the Crocker sale and PNB offer should be deemed to constitute a commercial sale/offer because there is no evidence to establish that they were made primarily for experimental purposes.

The present invention has application in any document processing operation where it is desirable to capture and display the images of the documents being processed. *It has been most recently adapted for remittance processing in commercial banks and is described in the specification in that context.*

[March 21, 1977 Patent Application, Plaintiff's Ex. F, p. 3.]

The above "disclosure" is also the only "disclosure" of prior commercial use contained in the CIP application. [See Plaintiff's Ex. J.]

TRW relies on the foregoing "commercial use" disclosure in both the original and the CIP applications as evidence proving that Maker did not "intentionally" conceal the Crocker Bank sale from the patent office.[10] TRW also argues that Unisys's evidence regarding Mr. Maker's "flip-flopping" of opinions of bar' dates is insufficient to give rise to an inference of intent to deceive the patent office so as to entitle Unisys to a summary judgment determination of inequitable conduct on the part of TRW and its patent counsel.

2. *TRW's Motion to Dismiss Unisys's Two–Count Counterclaim*

With respect to TRW's Rule 12(c) Motion for a judgment of dismissal on the pleadings

of Unisys's antitrust counterclaim,[11] TRW argues that Unisys has not alleged and cannot allege that TRW's patent infringement lawsuit is a "sham", such that it is "objectively baseless" in the sense that "no reasonable litigant could realistically [have] expect[ed] success on the merits," as recently defined by the Supreme Court in *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.,* —— U.S. ——, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993). Therefore, TRW contends that, under that case, it is absolutely immune from antitrust attack.

Unisys counters that the *Professional Real Estate Investors* "objectively baseless" standard does not apply to either of the two counts in its counterclaim, and even if it does, Unisys claims that its pleadings sufficiently satisfy that standard to withstand a Rule 12(c) motion for dismissal on the pleadings.

This Opinion will first discuss the parties' Rule 56 motions for summary judgment, and then will discuss TRW's Rule 12(c) motion to dismiss Unisys's counterclaim.[12]

## IV. *DISCUSSION*

### A. *STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT*

Summary judgment is proper " 'if the pleadings, depositions, answer to interrogato-

---

**10.** TRW admits that Maker did not disclose either the Crocker Bank sale or the PNB offer specifically to the patent office because he had determined that no commercial "sale" had occurred more than one year prior to the filing of the original patent application. He testified at his deposition that it was his practice with respect to disclosing sales as part of the prior art disclosure to the Patent Office, was first to determine if a sale had occurred more than one year before the filing date. If he found such a sale, the client was advised it could not file an application. If he found there was no "sale" within the meaning of Section 102(b), the filing went forward and the activity was not disclosed. [Maker dep., Plaintiff's Ex. G, pp. 52, 340–342.]

**11.** Unisys has asserted a two-count antitrust counterclaim—one count setting forth a "fraudulent procurement of the patent" (i.e., fraud upon the patent office) claim under *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.,* 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965), and a second count alleging "fraud upon the court".

**12.** As provided in the Federal Rules of Civil Procedure, when matters outside the pleadings are considered in connection with a Rule 12(c) motion, "the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." Fed.R.Civ.Pro. 12(c). Discovery in this case has been exhaustive, and numerous matters "outside the pleadings" have been presented to the Court throughout the course of litigation and, in particular, in connection with the parties' on-sale bar/inequitable conduct summary judgment motions. Because the Court finds the same discovery materials presented in connection with the summary judgment motions relevant to the issues presented in Plaintiff's Rule 12(c) motion for dismissal of Defendant's counterclaim, the Court will consider these materials in connection with the Rule 12(c) motion, as well, and accordingly, the motion to dismiss will be treated as a Rule 56 motion for summary judgment.

ries, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Fed.R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[13] According to the *Celotex* Court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

▪ After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment. They are summarized as follows:

* Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in or-

der to defeat a properly supported motion for summary judgment."

* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989). The Court will apply the above principles in deciding the parties' motions for summary judgment in this case.

B. *THE INVENTION WAS "ON SALE", WITHIN THE MEANING OF 35 § 102(b), MORE THAN ONE YEAR BEFORE THE MARCH 21, 1977 PATENT APPLICATION.*

35 U.S.C. § 102(b) sets forth what is commonly known as the "on-sale bar" rule. That section provides in pertinent part:

> A person shall be entitled to a patent unless—
>
> \*       \*       \*       \*       \*       \*
>
> (b) the invention was ... on sale in this country, more than one year prior to the date of the application for patent in the United States....

35 U.S.C. § 102(b).

▪ The policies underlying the one year on-sale bar are: (1) to discourage removal of inventions from the public domain when the public has reasonably come to believe that they are freely available; (2) to promote the prompt and widespread disclosure of inventions; (3) to allow the inventor a reasonable amount of time following sales activities (set by statute as one year) to determine the potential economic value of the patent; and (4) to prohibit the inventor from commercial-

---

**13.** "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A C. Wright, A. Miller, M. Kane, *Federal Practice & Procedure*, § 2727, at 33 (1993 Supp.).

ly exploiting his invention beyond the statutorily prescribed time. *Envirotech Corp. v. Westech Engineering, Inc.*, 904 F.2d 1571, 1574 (Fed.Cir.1990); *UMC Electronics Co. v. United States*, 816 F.2d 647, 652 (Fed.Cir. 1987), *cert. denied*, 484 U.S. 1025, 108 S.Ct. 748, 98 L.Ed.2d 761 (1988).

■ The issue of whether an invention is "on sale" is a question of law for the court to decide. *Paragon Podiatry Laboratory Inc. v. KLM Laboratories, Inc.*, 984 F.2d 1182 (Fed.Cir.1993); *UMC Electronics Co. v. United States, supra*, 816 F.2d 647, 657. However, no single finding or conclusion is a *sine qua non* to the resolution of this issue; rather, the totality of the circumstances must always be considered. *Envirotech Corp. v. Westech Engineering, Inc., supra*, 904 F.2d 1571, 1574.

■ The ultimate determination of whether a patent is rendered invalid by the Section 102(b) "on-sale bar" calls for application of a two-pronged test: First, the court must decide whether there was a for-profit "sale" or "offer for sale" made outside of the one-year grace period provided in Section 102. *UMC Electronics v. United States, supra*. If the court finds that there was such a "sale" or "offer for sale", then the court must decide, from the totality of the circumstances, whether, at the time of the sale or offer for sale, there had been sufficient development of the invention to render it a tangible, marketable product. *Id.*

1. *Was a For–Profit "Offer for Sale" Made in This Case?*

■ The "on-sale bar" provision of Section 102(b) does not require a fully accomplished "sale"; rather, simply offering the product for sale may trigger operation of the bar. *Buildex, Inc. v. Kason Industries, Inc.*, 849 F.2d 1461 (Fed.Cir.1988); *UMC Electronics Co. v. United States, supra; King Instrument Corp. v. Otari Corp.*, 767 F.2d 853 (Fed.Cir.1985), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1197, 89 L.Ed.2d 312 (1986); *Jack Winter, Inc. v. Koratron Co., Inc.*, 375

F.Supp. 1 (N.D.Cal.1974), supp. op., 409 F.Supp. 1019 (N.D.Cal.1976). Indeed, an offer for sale can invalidate a patent even if it is made only to a single customer and even if the offer is made before commercial production has begun. *Jack Winter, Inc., supra.*

■ A patentee's commercial activity need not rise to the level of a formal "offer" under contract law principles to trigger the "on-sale bar". *Keystone Retaining Wall Systems, Inc. v. Westrock, Inc.*, 792 F.Supp. 1552 (D.Or.1991). The product will be deemed to have been "on sale" if the patentee engages in activities demonstrating an intent to sell the product, *Jack Winter, supra*, so long as the activities consist of more than merely indefinite or nebulous discussions about possible sale. *Keystone, supra.* Merely quoting a price to a potential customer when the invention is sufficiently developed can render a patent invalid under 35 U.S.C. § 102(b). *Sonoscan, Inc. v. Sonotek, Inc.*, 936 F.2d 1261 (Fed.Cir.1991).[14]

■ However, a product which was sold or offered for sale more than a year before the filing of the patent application may escape the statutory bar if the sale was "primarily for a bona fide experimental purpose to perfect the invention," rather than primarily for profit. *Paragon Podiatry Laboratory v. KLM Laboratories, supra*, 984 F.2d at 1185. *See also, Sinskey v. Pharmacia Ophthalmics, Inc., supra*, 982 F.2d at 498.

In determining whether a sale was primarily for experimental purposes, the inventor's subjective intent to experiment in making the sale is generally of minimal value. *Paragon Podiatry, supra*, 984 F.2d at 1186, *quoting, TP Laboratories, Inc. v. Professional Positioners, Inc.*, 724 F.2d 965, 971 (Fed.Cir. 1984). Evidence of such subjective intent to experiment is especially accorded minimal weight when that evidence consists of after-the-fact deposition testimony. *In re Smith*, 714 F.2d 1127, 1135 (Fed.Cir.1983). *See also TP Laboratories, supra* ("[T]he expression by an inventor of his subjective intent to experiment, particularly after institution of

---

**14.** However, a subjective, uncommunicated intention of the offeror, however clear, is not, in and of itself, sufficient. *Envirotech Corp. v. Wes-* *tech Engineering Inc., supra*, 904 F.2d 1571, 1575.

litigation, is generally of minimal value." 724 F.2d at 972.) The court in *Sinskey, supra,* explained:

> Post-hoc [deposition and] affidavit testimony alone, years after the events described and purporting to show an inventor's subjective experimental intent, will never satisfy the burden of establishing experimental use in a case like this where there is no contemporaneous evidence of experimental purpose and the objective evidence is to the contrary.

982 F.2d at 499.

■ TRW argues that its Crocker Bank system was not "on sale" more than one year prior to the filing of the original patent application because it contends that the system was built for primarily experimental purposes, and not primarily for profit. In support of its "experimental" characterization, TRW argues that its pre-March 21, 1976 work on the Crocker system was "developmental" work. Thus, TRW equates the term "developmental" with the term "experimental". In support of its "research and development" theory, TRW relies primarily on the discovery deposition testimony of David Fain, Teknekron's supervisor on the Crocker project and Richard Griffith, who signed the Teknekron–Crocker Agreement on behalf of Crocker Bank.[15] Both Mr. Fain and Mr. Griffith labeled the Crocker Bank contract during their depositions as a "developmental" or "research and development" contract. [See excerpts of Fain's and Griffith's deposition testimony in Plaintiff's Memorandum on Opposition to Defendant's Motion for Summary Judgment and in Plaintiff's Brief in Support of its own cross-motion on the On–Sale Issue.] TRW also relies upon Fain's affirmative response when asked "Did you conduct any tests?", and his testimony that work on the machine (largely assembling parts) continued after it was delivered to Crocker in May 1976.

TRW also wants the Court to read the Agreement as not calling for a "purchase price", but rather only calling for payment to Teknekron of $1,093,101.00 for its "services".[16] However, the evidence reflects that Crocker paid Teknekron not only for its "services", but also for all of the equipment and components of the system at the price paid by Teknekron plus 15%.

Viewing all of the evidence presented by TRW on the "experimental vs. profit" issue, the Court finds TRW's evidence to be insufficient proof that the Crocker Bank system was sold or offered for sale for primarily experimental purposes, and not primarily for profit. There is nothing in the Teknekron–Crocker Agreement that states Teknekron was constructing the Crocker system for purely, or primarily, or even partially experimental purposes. Rather, it is clear to the Court that what the Agreement really called for was the sale of a system designed and constructed for the specific needs of Crocker for a profit.[17] There is no question in the Court's mind that the intent of Teknekron in entering into the Agreement with Crocker in December 1974—as evidenced by the plain language of the August 1974 Teknekron study report and proposal, and the December 1974 Agreement itself—was to sell a product to Crocker for profit.

The December 1974 Agreement explicitly provided that Teknekron would design the system, procure component parts, and assemble and install the system. [Agreement, Article I, DDX 36, p. 2.] In exchange, the bank agreed to pay Teknekron $554,000.00,

---

**15.** Griffith left Crocker Bank shortly after entering into the Agreement to go to work for Teknekron as an Executive Vice President of Teknekron's Banking Division. Griffith eventually left that position and is no longer employed by Teknekron.

**16.** The original agreement called for Crocker to pay Teknekron $554,000, however, that amount was increased several times in subsequent amendments to the agreement due to unforeseen increased costs. In April 1975, the price was increased to $670,000. In December 1975, that amount was increased to $841,090. Finally, in June 1976, the amount was again increased to $1,093,101.

**17.** To the extent that TRW relies upon the labeling of the Teknekron/Crocker Bank Agreement as a "developmental" or "services" contract, such labels are not determinative of the issue of whether a product was or was not actually offered for commercial sale. *See RCA Corp. v. Data General Corp.,* 887 F.2d 1056, 1062–1063 (Fed.Cir.1989).

to cover labor costs, *and* all direct costs of the system at a price of actual cost plus 15%. [*Id.* at Article II, DDX 36, p. 3.]

In short, the motivation behind the Crocker sale was to make a profit—there is simply no credible, independent contemporaneous evidence to the contrary.[18]

### 2. When Was the Invention "Sufficiently Developed"?

As discussed above, the Court's determination that a for-profit offer for sale was made does not end its "on-sale bar" inquiry. The question remains, "What did Teknekron actually have to sell Crocker in December of 1974?"

TRW contends that in December 1974, since no system had yet been built, all that Teknekron had to sell was a "concept". Therefore, TRW argues, there was not as of that date any developed invention which could have been placed "on sale" to trigger the running of the statutory on-sale bar.

The Court tends to agree that when Teknekron initially entered into the December 1974 Crocker Bank contract, it did not have a sufficiently developed product to trigger operation of the statutory "on-sale bar". However, the Court believes that even this is a close question.

Our analysis begins with the Federal Circuit's decision in *UMC Electronics Co. v. United States, supra,* that "reduction to practice" of an invention would no longer be a *per se* requirement in all cases before operation of the on-sale bar provisions of 35 U.S.C. § 102(b) would be triggered. However, although the *UMC* court held that reduction to practice was not an absolute requirement to activate the on-sale bar statute, the court made clear that there still must be something more than a mere "concept" in existence at the time of the sale or the offer to sell in order to trigger the operation of the bar. The *UMC* court explained:

[W]e conclude that reduction to practice of the claimed invention has not been and

should not be made an absolute requirement of the on-sale bar.

*We hasten to add, however, that we do not intend to sanction attacks on patents on the ground that the inventor or another offered for sale, before the critical date, **the mere concept of the invention.*** Nor should inventors be forced to rush into the Patent and Trademark Office prematurely. On the other hand, we reject, UMC's position that as a matter of law no on-sale bar is possible unless the claimed invention has been reduced to practice in the interference sense.

We do not reject "reduction to practice" as an important analytical tool in an on-sale analysis. A holding that there has or has not been a reduction to practice of the claimed invention before the critical date may well determine whether the claimed invention was in fact the subject of the sale or offer to sell or whether a sale was primarily for an experimental purpose. A holding that there is a reduction to practice of the claimed invention may, of course, lighten the burden of the party asserting the bar. Thus, we simply say here that the on-sale bar does not necessarily turn on whether there was or was not a reduction to practice of the claimed invention. *All of the circumstances surrounding the sale or offer to sell, **including the stage of development of the invention** and the nature of the invention, must be considered and weighed against the policies underlying section 102(b).*

The above conclusion does not lend itself to formulation into a set of precise requirements. . . . However, we point out certain critical considerations in the on-sale determination and the respective burdens of proof which have already been established in our precedent. Thus, without question, the challenger has the burden of proving that there was a definite sale or offer to sell more than one year before the application for the subject patent, and that the subject matter of the sale or offer to sell fully anticipated the claimed invention or would have rendered the claim invention

---

18. The foregoing discussion establishes that Edward Maker's "re-analysis" of the on-sale bar issue, and his determination that the system was

not "on sale" prior to the actual "delivery" of the system to Crocker in May 1976, was incorrect.

obvious by its addition to the prior art. If these facts are established, the patent owner is called upon to come forward with an explanation of the circumstances surrounding what would otherwise appear to be commercialization outside the [one-year] grace period. The possibilities of such circumstances cannot possibly be enumerated. *If the inventor had merely a conception or was working towards development of that conception it can be said there is not yet any "invention" which could be placed on sale....*

816 F.2d at 656–657 [citations and some punctuation omitted; emphasis added.]

■ The Court views this case as presenting a very close question because Teknekron itself represented in the Crocker Bank Feasibility Study Report/Proposal in August 1974, and in the December 1974 Agreement, that all of the major component parts were fully developed. The Study Report further contained technical drawings showing the feasibility of the integrated process of the system. The feasibility of operation of the system as intended was, in fact, described in great detail in the August 1974 Study Report as follows:

The system is comprised of the following basic components: a front end high speed scanner which contains a video camera; video bulk storage devices; a mini-computer system containing a disk, printer and two magnetic tape drives; 10 terminals each having a CRT and keyboard; and a back end high-speed reader/sorter.

After the mail is cut, the OCR coupon(s) and check(s) are placed in a high speed data capture device. First the coupon is scanned and the captured digital data stored. Then the coupon passes a video camera and an exact video image of the coupon is stored under control of the digital information. Next the check is read by MICR and this information is stored with the digital coupon data. The video image of the check is saved along with the coupon image. The documents are then fed into a staging bin where they reside until the processing is completed. With a reader

speed of 500 documents/minute, 30,000 coupons and checks can be read per hour....

Periodically, either under operator or system control, the processed transactions are moved out of the staging area for the checks to be MICR encoded and the checks/coupons to be sorted by client. If a document has not been processed it goes to the re-staging bin. The processed component is fed into a reader/sorter and binned. The associated check is scanned and a validity check is performed using the originally captured data for comparison. If everything agrees, the check is automatically MICR encoded and binned....

[DDX 213, pp. 5.12–5.13.]

The foregoing makes clear to the Court that as of December 1974, Teknekron's system was clearly more than a mere "pie-in-the-sky" concept. Indeed, each of the component parts of the system were well-developed and the technology was clearly available to combine the component parts into a fully integrated system. In short, the Teknekron people knew very well that the system they were selling to Crocker was within imminent technical achievability.

■ However, at the same time, there is no question that there was no *actual* development of the final integrated video document processing system until after work was commenced on the Crocker Bank lockbox project. Thus, although Teknekron clearly had a feasible, realistically attainable concept that it offered for sale, that concept had yet to be actually realized in practice.

Although a very close question, the Court cannot find by clear and convincing evidence—as is required—that, at the time of the December 1974 Agreement with Crocker Bank, Teknekron's video document processing system was sufficiently developed to trigger application of the section 102(b) "on-sale bar".[19]

■ But, even this finding does not end our inquiry. The Crocker Bank transaction was not the only sale or offer to sell involved

---

19. Existence of an on-sale bar must be proven by clear and convincing evidence. *See Manville* *Sales Corp. v. Paramount Systems, Inc.,* 917 F.2d 544, 549 (Fed.Cir.1990), and cases cited therein.

in this case. In April 1975, Teknekron approached Philadelphia National Bank, as well as a number of other banks, proposing to develop for each of the banks approached a lockbox system similar to the one developed for Crocker Bank. With respect to PNB, specifically, Teknekron made a firm offer in its final PNB Automated Lockbox Study Report to provide PNB with an automated lockbox system similar to Crocker Bank's on January 19, 1976.[20] The proposal stated a definite price for the system ($859,500.00), and the system proposed in the offer embodied all of the claims of '780 patent. [See Part IV of the PNB Study Report, at DDX 40 pp. 4–1 to 4–2; 4–17.]

The question, therefore, becomes whether, when Teknekron made its proposal to PNB on January 19, 1976, its video document processing system was by then sufficiently developed so as to take it out of the "conception" sphere, and place it within that of a "developed" product. The Court finds that the system was sufficiently (if not substantially) developed as of December 17, 1975 (after nearly a year's work on the project), when inventor Emmett Burns took the Crocker Bank project team to view the "hybrid" system, with essentially all of its components, in operation at Teknekron's facility. The minutes of the Crocker Bank project team meeting on December 17, 1975 state, in pertinent part, as follows:

> E. Burns took the group to the development section of Teknekron to view various components of our new Lockbox System in operation. Bill Dixon, supervisor in charge of development of the Crocker

**20.** Teknekron's January 19, 1976 report to PNB which contained the proposal was subsequently amended on March 11, 1976. However, it appears that the proposal itself was not substantially changed. In fact, PNB's letter July 29, 1977 acceptance letter stated that PNB was accepting Teknekron's offer to provide PNB with a "Remittance Processing System essentially as described in your proposal *dated January 19, 1976.*"

**21.** Arguably, the system was sufficiently developed well before December 17, 1975. From April through October 1975, even Teknekron itself was representing to banks across the country that it already had a system in operation.

For example, on April 22, 1975, Gerald Burnett of Teknekron represented to the First National Bank of Chicago:

Lockbox System, conducted the system tour.

We viewed:

*Reader/Sorter* —with video camera and the AB Dick video-jet sprayer attached. Each item is imprinted with a sequence number, passes through video camera then passes through to sort pocket. A TV monitor was hooked up so we could view about every tenth item passing sort.

*TV Monitor with hook up to video disc.* As items are captured by video camera, the information is held within the video disc until called up on the screen. Under simulated conditions of terminal operation, we checked for clarity of check display on screen; discussed possible viewing fatigue factors; and questioned actual operation of video disc. Various problems and questions were interjected. Among them, the possible life span of a video disc; who would service the unit; whether it would lose quality with progression into disc; and other pertinent questions. Bill Dixon answered our questions satisfactorily. The demonstration model of the video disc amazed everyone as to how it could be kept unenclosed, and be unaffected by various elements as dust, light or noise.

[Minutes of Meeting held at Teknekron on Dec. 17, 1975, at DDX 154, p. 1.] *See also,* DDX 153, p. 1, Minutes of Meeting held at Crocker, December 9, 1975 ("E. Burns stated that for our system progress, one of everything (in the system) is working. . . . The *"hybrid" machine will be working by the 15th."*)[21]

> Teknekron has been working for over a year with Crocker National Bank in order to develop an innovative and cost effective system for lock box automation. In this effort we have used both our hardware engineering and software development expertise. *We have been successful and are implementing a system* that will lower retail and wholesale costs while providing excellent production statistics to monitor both individual productivity and cost by account, outputs tailored to the needs of clients, easy expandability for increasing volume, and improved personnel morale. . . .
> [Defendant's Hearing Ex. 4.]

On April 30, 1975, Richard Griffith of Teknekron—who had previously worked at Crocker—made the same representation to Philadelphia National Bank. [See DDX 47.] That same rep-

TRW argues that the system should not be deemed to have been sufficiently developed as of Teknekron's January 19, 1976 proposal to PNB because there continued to be "problems" with some of the functions of the system that Teknekron continued to work on after that date, and the system was not processing "live" documents until after it was delivered to Crocker.

The "continued problems" argument is essentially the same argument made by the plaintiff—and *rejected* by the Federal Circuit—in the *UMC Electronics* case. In *UMC*, the court found, over the plaintiff's objections of continued development of the invention, that the later-patented accelerometer had been sufficiently developed to take it beyond the "conception" classification as of the date of UMC's offer to sell the invention to the Navy. The *UMC* court explained its determination as follows:

UMC made a definite offer to sell its later patented UMC–B accelerometer to the Navy more than one year prior to the date of the application for the patent in suit. In its bid, UMC specified a price of $404.00 for each sensor component of the ACA and $271.00 for the compatible recorder component. The total contract price was in excess of $1.6 million. This written offer which revealed use of the analog transducer in the ACA was supplied on July 27, 1967. UMC admits that the offer it made was for profit, not to conduct experiments.

UMC's activities evidence, at least *prima facie*, an attempt to commercialize the invention of the '513 patent by bidding on a large government contract more than one year prior to the filing of the underlying application and thereby to expand the grace period in contravention of the policies underlying the statute.

Countering the *prima facie* case, *UMC offers only the purely technical objection that no* **complete** *embodiment of the invention existed at the time of the sale. In this case, that circumstance is unavailing*

*when we look at the realities of the development of this invention. While* **UMC asserts that its improved ACA required further "development",** *... that fact might weigh in UMC's favor if UMC had sought by convincing evidence to prove that the primary purpose of the sale was for experimental work. However, the contract was not a research and development contract,* and UMC admits that the offer it made* **was** *for profit, not to conduct experimental work.*

We do not attempt here to formulate a standard for determining when something less than a complete embodiment of the invention will suffice under the on-sale bar. *However, the development of the subject invention was far beyond a mere conception.* **Much of the invention was embodied in tangible form.** *The prior art devices embodied each element of the claimed invention, save one, and that portion was available and had been sufficiently tested to demonstrate to the satisfaction of the inventor that the invention as ultimately claimed would work for its intended purpose.* **Thus, we conclude from the unchallenged facts with respect to the commercial activities of UMC, coupled with the extent to which the invention was developed, the substantial embodiment of the invention,** *the testing which was sufficient to satisfy the inventor that his later claimed invention would work, and the nature of the inventor's contribution to the art,* **that the claimed invention was on sale within the meaning of section 102(b).**

816 F.2d 647, 657 (emphasis added). *See also, Sonoscan, Inc. v. Sonotek, Inc., supra,* 936 F.2d 1261, 1263–1264 (invention held to be sufficiently developed to trigger the operation of the Section 102(b) on-sale bar where evidence showed that a working prototype of the invention which contained the most important feature of the invention existed at the time of the plaintiff's price quotation to a prospective customer.)

resentation was reiterated to PNB on October 15, 1975 [See DDX 49, p. 2.]

Furthermore, Inventor Emmett Burns told patent attorney Edward Maker that in the summer of 1975, Teknekron's sales people had customers in to see the system work. [See Unisys' Supplemental Brief, Ex. HX–15.]

Just as the court found in *UMC,* in this case it is clear from the evidence presented that when Teknekron made its concrete offer to provide PNB with its later-patented video document processing system on January 19, 1976, the system was sufficiently developed to take the invention out of the "concept" sphere and place it squarely within the "tangible developed product" sphere. The patent application was filed on March 21, 1977, more than 14 months later.

For these reasons, the Court finds that the video remittance processing system which is the subject of the '780 patent was "on sale" more than one year before the filing of the patent application, and, therefore, by application of 35 U.S.C. § 102(b), the patent-in-suit is invalid. Accordingly, Defendant's Motion for Summary Judgment will be granted on the basis of the statutory "on-sale bar", and Plaintiff's cross-motion on this issue will, accordingly, be denied.

Defendant also requests a summary judgment determination that patent attorney Edward Maker knew of the on-sale invalidity of the patent when he made the patent application for his clients, and intentionally withheld that "on-sale bar" information from the patent examiner such that TRW should be found guilty of "inequitable conduct" for fraud upon the patent office.

## C. *EDWARD MAKER WAS NOT GUILTY OF INEQUITABLE CONDUCT*

The requirements of "inequitable conduct" were succinctly set out by the Federal Circuit in *FMC Corp. v. Manitowoc Co., Inc.,* 835 F.2d 1411 (Fed.Cir.1987):

"Inequitable conduct" is not, or should not be, a magic incantation to be asserted against every patentee. Nor is that allegation established upon a mere showing that art or information having some degree of materiality was not disclosed. To be guilty of inequitable conduct, one must have intended to act inequitably. Thus, one who alleges a "failure to disclose" form of inequitable conduct must offer clear and convincing proof of: (1) prior art or information that is material; (2) knowledge chargeable to [the] applicant of that prior

art or information and of its materiality; and (3) failure of the applicant to disclose the art or information *resulting from an intent to mislead the PTO.* That proof may be rebutted by a showing that: (a) the prior art or information was not material (e.g., because it is less pertinent than or merely cumulative with prior art or information cited to or by the PTO); (b) if the prior art or information was material, a showing that applicant did not know of that art or information; (c) if applicant did know of that art or information, a showing that applicant did not know of its materiality; (d) *a showing that applicant's failure to disclose art or information did not result from an intent to mislead the PTO.*

Thus, a balancing of overlapping considerations is involved in determining, in view of all the circumstances, the presence or absence of inequitable conduct.

*Id.* at 1415 (emphasis added). *See also, LaBounty Manufacturing, Inc. v. United States International Trade Commission,* 958 F.2d 1066 (Fed.Cir.1992) ("[I]f an applicant withholds material information from the PTO *with intent to affect the allowance of claims,* the applicant may be found guilty of inequitable conduct and the patent obtained would be rendered unenforceable." *Id.* at 1070 (emphasis added).)

In support of its "inequitable conduct" argument, Unisys relies upon Edward Maker's memoranda and correspondence (discussed in detail in Section II(B), *supra*) indicating that Maker originally was of the opinion that the statutory on-sale bar began to run in April 1975 when Teknekron first approached a number of banks, including Philadelphia National Bank, about its automated lockbox system. Maker and his fellow Flehr, Hohbach patent attorneys subsequently re-evaluated the "on-sale bar" date issue, and concluded in late March, 1976 that the agreement with Crocker National Bank was essentially a contract for the sale of services, not for the sale of goods, and an actual "sale" of the invention had not yet occurred because, as of that date, the system had not yet been delivered to Crocker or been accepted by it.

TRW admits that Maker did not specifically disclose either the sale to Crocker Bank, or the offer to Philadelphia National Bank to the patent office. As noted above in this Opinion, the only disclosure made by Maker to the patent office of pre-March 21, 1977 commercial use of the invention was in the "specification" portion of the patent application which stated:

The present invention has application in any document processing operation where it is desirable to capture and display the images of the documents being processed. *It has been most recently adapted for remittance processing in commercial banks and is described in the specification in that context.*

[Plaintiff's Ex. F, p. 3.]

Maker testified in his deposition that it was his practice with respect to disclosing commercial activities involving an invention to the patent office to first determine if a legally cognizable "sale" had occurred more than one year before the filing date. If he found such a sale, the client was advised it could not file a patent application. If he concluded there was no cognizable "sale" within the meaning of section 102(b), the filing went forward and the activity was not disclosed. [Maker deposition., Plaintiff's Ex. G, pp. 52, 340–342.]

What requires emphasis here is that, at the time of the making of the patent application in March 1977, the law was not clear that completion of an invention or "reduction to practice" was not required to render a product subject to the "on-sale bar". Rather, as of the patent filing date, the controlling precedent for "on-sale bar" determination was the three-part test set out in *Timely Products Corp. v. Arron*, 523 F.2d 288 (2d

Cir.1975). That test required the establishment of all three of the following elements:

(1) The complete invention claimed must have been embodied in or obvious in view of the thing offered for sale....

(2) The invention must have been sufficiently tested to verify that it is operable and commercially marketable. This is simply another way of expressing the principle that *an invention cannot be offered for sale until it is completed, which requires not merely its conception but its reduction to practice....*

(3) Finally, the sale must be primarily for profit for profit rather than for experimental purposes....

*Id.* at 302 (citations omitted and emphasis added.)

It was not until 1987, when the Federal Circuit decided *UMC Electronics v. United States, supra,* that the "reduction to practice" requirement was eliminated as a mandatory requirement in all cases. It is clear to the Court that Maker's 1976 reassessment of the on-sale bar date as to whether reduction to practice was necessary was at least arguably consistent with the controlling law at the time.[22]

■ Moreover, the evidence relied upon by Unisys in support of its inequitable conduct arguments—to-wit, Maker's various changes of opinions of the on-sale bar date—do not, in this Court's view, amount to such clear and convincing evidence of intent to deceive the patent office. It is well established that a patent attorney's erroneous judgment or even gross negligence—which, at most, is what the evidence relied upon by Unisys demonstrates in this case—is not sufficient to give rise to an inference of intent to deceive. *Hycor Corp. v. Schlueter Co.,* 740

---

**22.** TRW argues that it should be afforded the benefit of this earlier "reduction to practice" rule in protecting it from the on-sale bar defense, i.e., because at the time that the patent application was filed, "reduction to practice" was required to trigger operation of the on-sale bar provisions of 35 U.S.C. § 102(b), the Court should apply this earlier rule in deciding the "on-sale bar" motions in this case. There is clearly no legal support for TRW's argument. Indeed, in *UMC Electronics v. United States, supra,* the court changed the law and applied that changed law in

its determination that, by operation of the on-sale bar, the patent at issue in that case was rendered invalid.

However, while the Court rejects TRW's argument that the now superceded "reduction to practice" rule should be given substantive effect, it is clearly relevant to Edward Maker's state of mind and intention at the time of filing the patent, and is, therefore, highly probative of TRW's defense to Unisys' claims of inequitable conduct.

F.2d 1529, 1538 (Fed.Cir.1984); *Halliburton Co. v. Schlumberger Technology Corp.*, 925 F.2d 1435, 1441–1443 (Fed.Cir.1991).

For these reasons, the Court will deny Unisys's motion for summary judgment in its favor on the basis of "inequitable conduct" of Maker in failing to specifically disclose the Crocker Bank and PNB Bank transactions to the patent office; rather, the Court will enter summary judgment in favor of TRW on this issue.[23]

### D. TRW'S MOTION FOR DISMISSAL OF UNISYS'S ANTITRUST COUNTERCLAIM

#### 1. Standards Applicable in the Court's Determination of TRW's Rule 12(c) Motion

Although generally, a Rule 12(c) motion for judgment on the pleadings is evaluated under the same standards applicable to motions for dismissal under Fed.R.Civ.Proc. 12(b)(6), *see, Scheid v. Fanny Farmer Candy Shop, Inc.*, 859 F.2d 434, 436 n. 1 (6th Cir.1988), where, as here, "matters outside the pleadings" are considered in connection with the motion, the Federal Rules of Civil Procedure require that the motion "be treated as one for summary judgment and disposed of as provided in Rule 56." Fed.R.Civ.Proc. 12(c). Discovery in this case has been exhaustive, and numerous matters "outside the pleadings"

have been presented to the Court throughout the course of litigation and, in particular, in connection with the parties' on-sale bar/inequitable conduct summary judgment motions. Because the Court finds the same discovery materials presented in connection with the summary judgment motions relevant to, and dispositive of, the issues presented in Plaintiff's Rule 12(c) motion for dismissal of Defendant's counterclaim, the Court will consider these materials in connection with the Rule 12(c) motion, as well, and accordingly, the motion to dismiss will be treated as a Rule 56 motion for summary judgment.

#### 2. Noerr–Pennington Immunity and the "Sham Litigation" Exception

TRW[24] seeks dismissal on the pleadings of Unisys's two-count antitrust counterclaim under the Supreme Court's recent decision in *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, *supra*, —— U.S. ——, 113 S.Ct. 1920. In that case, the Supreme Court established a two-part definition of "sham" litigation for purposes of determining whether or not an antitrust defendant (here, counter-defendant TRW) is entitled to immunity from antitrust litigation under the *Noerr–Pennington* doctrine.[25]

---

**23.** Although TRW has not cross-moved for summary judgment on the "inequitable conduct" issue, because both parties have been given an opportunity to present evidence supporting their respective positions on this issue and, in fact, have presented an abundance of evidence, and because the Court has considered all of this evidence and has determined that no genuine issue of material fact exists, entry of summary judgment in favor of TRW is appropriate. *See,* 10A C. Wright, A. Miller, M. Kane, *Federal Practice & Procedure,* § 2720, pp. 29–34 and cases cited therein.

**24.** In connection with the Rule 12(c) motion to dismiss, "TRW" refers to both TRW Financial Systems, Inc., the plaintiff in the principal patent infringement action, and TRW, Inc., TRW Financial Systems' parent corporation. Both the parent and subsidiary are counterclaim defendants in this action.

**25.** What has commonly come to be known as the "*Noerr–Pennington* doctrine" or "*Noerr* immunity", has developed from the Supreme Court's

decisions in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); and *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). The doctrine stands for the proposition that the exercise of First Amendment rights in seeking governmental action—including litigation—cannot form the basis of antitrust liability, even if the action injures a competitor.

In *Noerr* and *Pennington*, the Court held that "the Sherman Act does not prohibit ... persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or monopoly." *Noerr,* 365 U.S. at 136, 81 S.Ct. at 529; *Pennington,* 381 U.S. at 669, 85 S.Ct. at 1592. In *California Motor Transport,* the Court extended *Noerr* to protect from antitrust liability citizens engaging in adjudicatory actions before administrative agencies and the courts. 404 U.S. at 510, 92 S.Ct. at 611.

The *Noerr–Pennington* doctrine immunizes those who petition the government from antitrust liability. However, *Noerr* and its progeny withheld immunity from activities (including litigation) determined to be a mere sham to cover an attempt to interfere directly with the business relationships of a competitor. *Noerr*, 365 U.S. at 144, 81 S.Ct. at 523. It was not until the *Professional Real Estate Investors ("PRE")* case that the Court set out a clear definition of "sham" litigation.

In *Professional Real Estate Investors*, the petitioners operated a hotel which rented videodiscs to its guests for use with videodisc players located in its rooms. Respondent Columbia Pictures held copyrights to the motion pictures recorded on PRE's discs. Columbia sued PRE for copyright infringement and PRE counterclaimed, alleging that Columbia's copyright action was a mere sham that cloaked underlying acts of monopolization and restraint of trade in violation of the Sherman Act.

The District Court granted summary judgment to PRE on the copyright claim, finding that rental of the videodiscs for in-room viewing did not constitute "public performance" of the movies as contemplated by Section 106 of the Copyright Act, 17 U.S.C. § 106(4). The Ninth Circuit affirmed and remanded the case for resolution of PRE's antitrust counterclaim.

On remand, Columbia sought summary judgment on PRE's counterclaim, arguing that the original copyright infringement action was no sham, and therefore was entitled to immunity under *Noerr–Pennington*. The District Court determined that, even though it had decided against Columbia on its copyright infringement action, it was a reasonable effort, given the lack of law on in-room movies and "public performance" under the copyright statutes. Therefore, the District Court concluded that "there was probable cause for bringing the [copyright] action", and as such, it did not constitute "sham" litigation within the *Noerr* immunity exception.

The Court of Appeals and the Supreme Court affirmed. In so doing, the Supreme Court noted the inconsistent and contradictory ways the courts of appeals defined "sham". ―― U.S. at ――, 113 S.Ct. at 1925. Therefore, the Court set out a two-part definition of "sham" litigation for purposes of *Noerr* immunity, as follows:

First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome,[26] the suit is immunized under *Noerr*, and an antitrust claim premised on the sham exception must fail. Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals an attempt to interfere *directly* with the business relationships of a competitor through the use of the governmental *process* —as opposed to the *outcome* of that process—as an anticompetitive weapon. This two-tiered process requires the plaintiff to disprove the challenged lawsuit's *legal* viability before the court will entertain evidence of the suit's *economic* viability. Of course, even a plaintiff who defeats the defendant's claim to *Noerr* immunity by demonstrating both the objective and subjective components of a sham must still prove a substantive antitrust violation. Proof of a sham merely deprives the defendant of immunity; it does not relieve the plaintiff of the obligation to establish all other elements of his claim.

*Id.* at ――, 113 S.Ct. at 1928 (emphasis in original; citations omitted).

The Supreme Court cautioned lower courts not to jump to the conclusion that the losing of an underlying action *ipso facto* means that the action was a "sham":

A winning lawsuit is by definition a reasonable effort at petitioning for redress and

---

**26.** The Court also restated this element of the test as satisfying the "probable cause" defense to a malicious prosecution claim, i.e., requiring "no more than a 'reasonable belief that there is a chance that a claim may be held valid upon adjudication.'" ―― U.S. at ――, 113 S.Ct. at 1928.

therefore is not a sham. *On the other hand, when the antitrust defendant has lost the underlying litigation, a court must "resist the understandable temptation to engage in* **post hoc** *reasoning by concluding" that an ultimately unsuccessful "action must have been unreasonable or without foundation." [Citation omitted.] The court must remember that "even when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing the suit."*

— U.S. at ——, n. 5, 113 S.Ct. at 1928, n. 5.

TRW argues that the foregoing test requires dismissal of both counts of Unisys's two-count counterclaim in this case because Unisys has not alleged in either count—and, according to TRW, simply cannot allege—any facts showing that TRW's patent action was "objectively baseless". Therefore, TRW argues that it must be deemed to be immune from antitrust liability under *Noerr–Pennington.*

Count I of Unisys's counterclaim is captioned as a *Walker Process* [27] claim of fraudulent procurement of the patent, and is predicated upon Unisys's allegations that Teknekron/TRW "intentionally, willfully, and fraudulently fail[ed] to disclose to the Patent Office any of its sale activities in violation of its duty of candor and full disclosure" and that "but for that [fraudulent] conduct, the '780 patent would not have been issued", and that "by the fraudulent procurement of the '780 patent and [Teknekron's TRW successors] attempts to enforce that patent through litigation and by forcing competitors to take licenses to the fraudulently procured patent, TFS and TRW have monopolized or attempted to monopolize the Relevant Market and Relevant Submarket." [Counterclaim, para. 22–23.]

Count II is captioned "sham litigation" and incorporates by reference all of the allegations of fraudulent conduct set forth in the paragraphs 1–26, including the above quoted paragraphs 22 and 23 and, paragraph 19 which alleges that in addition to fraudulent concealment of information from the patent office "TFS and its counsel began a concerted effort during the course of this litigation to conceal information called for in discovery, ordered by the Court, and directly material to TFS's fraudulent conduct before the Patent Office." [Counterclaim, para. 19.] The "concealed information" which Unisys refers to in Count II is information regarding Edward Maker's "flip-flopping" with respect to his assessment of the "on-sale bar" date.

Unisys points out in its Response Brief that in *Professional Real Estate Investors,* the Supreme Court excluded from its holding fraudulent and unethical conduct, including specifically conduct which the Court noted provides the basis of a *Walker Process* claim. The Court stated:

In surveying the forms of illegal and reprehensible practice which may corrupt the administrative or judicial processes and which may result in antitrust violations, we have noted that "unethical conduct in the setting of the adjudicatory process often results in sanctions" and that "misrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process." *California Motor Transport,* 404 U.S. at 512–513 [92 S.Ct. at 612–613]. *We need not decide here whether and, if so, to what extent Noerr permits the imposition of antitrust liability for a litigant's fraud or other misrepresentations. Cf.* Fed.R.Civ.Proc. 60(b)(3) (allowing a federal court to "relieve a party ... from a final judgment" for "fraud ..., misrepresentation, or other misconduct of an adverse party"); *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.,* 382 U.S. 172, 176–177 [86 S.Ct. 347, 349–350, 15 L.Ed.2d 247] (1965); *id.,* at 179–180 [86 S.Ct. at 351] (Harlan, J., concurring).

— U.S. at ——, n. 6, 113 S.Ct. at 1929, n. 6 (emphasis added).[28]

---

**27.** *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.,* 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965).

**28.** Unisys also relies on *California Motor Transport Co. v. Trucking Unlimited, supra,* in which the Supreme Court made clear that "[u]se of a patent obtained by fraud to exclude a competitor from the market may involve a violation of the

Relying on the above highlighted excerpt, and predicating its counterclaim on its allegations of "inequitable conduct" on the part of Teknekron patent prosecution attorney Edward Maker, Unisys argues that the narrow "sham" litigation requirements for abrogation of *Noerr* immunity set forth in *Professional Real Estate Investors* case are inapplicable.

■ Both of Unisys's counts are predicated upon allegations of fraudulent conduct, both in the procurement of the patent and in the conduct of counsel in the course of this litigation. Both of these counts, however, are dependent upon a determination that Teknekron's patent counsel, Edward Maker, intentionally, with intent to deceive, withheld on-sale bar information from the patent office. As set forth above in this Opinion and Order, this Court has determined that the conduct of Mr. Maker in changing his mind about the on-sale bar deadline was understandable given the unsettled state of the law regarding "reduction to practice" at the time, and therefore, found no "intent to deceive". Thus, while Unisys may be correct that *Noerr–Pennington* immunity may not apply in cases involving procurement of patents by fraud, because the Court has found no fraudulent procurement in this case, Unisys's arguments regarding fraudulent conduct exceptions to *Noerr–Pennington* immunity are irrelevant. Therefore, the Court will apply the "objectively baseless/"sham litigation" test of the *Professional Real Estate Investors* to determine whether TRW is cloaked with *Noerr–Pennington* immunity against Unisys's antitrust counterclaim.

*Professional Real Estate Investors* cautions lower courts not to engage in after-the-fact assessments of whether the lawsuit underlying an antitrust claim—when it was filed—was objectively baseless so as to render it a "sham": "The court must remember

that 'even when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing the suit.'" —— U.S. at ——, n. 5, 113 S.Ct. at 1928, n. 5 (citation omitted).

Guided by the foregoing principles, the Court finds insufficient basis for finding that TRW's suit for patent infringement was "objectively baseless" so as to render this litigation a "sham". TRW's argument that its patented video document processing system was not sufficiently developed as of January 1976 was not wholly unreasonable. There is no clear cut rule of law on the "sufficient development" issue; rather, each case turns on its own facts. Thus, the Court cannot say that TRW's suit for patent infringement was so wholly "objectively baseless" so as to render it a "sham."

That TRW's decision to file suit was not for sham purposes is further established by the 80–page memorandum of former TRW attorney John Schlicher. In his detailed opinion memo regarding validity of the '780 patent, Mr. Schlicher discussed and analyzed the *UMC Electronics* case which eliminated the "reduction to practice" requirement, and other federal cases addressing that issue. Based upon his analysis, Schlicher concluded that it was likely that even after *UMC*, a court would not wholly disregard a reduction to practice or insufficient development argument. [See Ex. D of Plaintiff's Response to Unisys's Supplemental Summary Judgment Brief.] Although the Court disagrees with Mr. Schlicher's ultimate conclusion of validity of the patent, it is clear from the memo that much thought was given to the filing of the instant lawsuit, and that it was not frivolously filed for anti-competitive reasons. Thus, the Court finds that there was no "sham" purpose in the institution of this action.

For these reasons, and by application of *Professional Real Estate Investors, Inc. v.*

---

antitrust laws" and is demonstrative of the kind of conduct *"not immunized* when used in the adjudicatory process." 404 U.S. at 512–513, 92 S.Ct. at 613. *See also, St. Joseph's Hospital v. Hospital Corp. of America,* 795 F.2d 948, 955 (11th Cir.1986) ("The plaintiff here has alleged misrepresentations before a governmental agency. When a governmental agency such as SHPA is passing on specific certificate applications it is acting judicially. Misrepresentations under

these circumstances do not enjoy *Noerr* immunity."); *Clipper Express v. Rocky Mountain's Motor Tariff,* 690 F.2d 1240, 1261 (9th Cir.1982) ("In the adjudicatory sphere, however, information supplied by the parties is relied on as accurate for decision making and dispute resolving. The supplying of fraudulent information thus threatens the fair and impartial functioning of these agencies and does not deserve immunity from the antitrust laws".)

*Columbia Pictures,* the Court finds that TRW is entitled to immunity from antitrust litigation under the *Noerr–Pennington* doctrine and, therefore, Unisys's antitrust counterclaims must be dismissed.[29]

### CONCLUSION

For all of the foregoing reasons,

IT IS HEREBY ORDERED that Defendant Unisys Corporation's Motion for Summary Judgment is GRANTED, in part, and DENIED in part. The Motion is granted on the issue of the statutory "on-sale bar", but denied with respect to the inequitable conduct issue of "intentional concealment" from the patent examiner of relevant on-sale bar information. With respect to the inequitable conduct/intentional concealment issue, summary judgment is hereby entered in favor of Plaintiff TRW.

IT IS FURTHER ORDERED that Plaintiff TRW's Motion for Partial Summary Judgment on the on-sale bar issue is DENIED.

IT IS FURTHER ORDERED that TRW's Rule 12(c) Motion to Dismiss Unisys Corporation's Counterclaims is hereby GRANTED.

---

**29.** To the extent that Unisys bases part of its counterclaim on concealment of documents during discovery in this case, as the Court has previously indicated to counsel, it views this purported "fraud on the court" claim to be a discovery sanctions issue, and as the parties are aware, the Court has the sanctions issue still under advisement. A separate Opinion and Order addressing the sanctions issue will follow.